**ISLAMIC CENTER OF MISSISSIPPI, INC., et al., Plaintiffs–Appellants,**

**v.**

**CITY OF STARKVILLE, MISSISSIPPI, Defendant–Appellee.**

No. 87–4083.

United States Court of Appeals, Fifth Circuit.

March 23, 1988.

Wilbur O. Colom, Colom & Colom, Columbus, Miss., for plaintiffs-appellants.

Lydia Quarles, Dolton W. McAlpin, McAlpin & Quarles, Starkville, Miss., for defendant-appellee.

Before RUBIN, WILLIAMS, and DAVIS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

█ The first amendment to the Constitution begins: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." These provisions, made applicable to the states by the due process clause of the fourteenth amendment, forbid government to burden the free exercise of any religion or to favor one religion over another.

█ The zoning ordinance of the City of Starkville, Mississippi, prohibits the use of buildings as churches in all of the areas within the city limits near the campus of the University of Mississippi unless an exception is granted by the City Board of Aldermen. There is no church in any part of the City in which churches are permitted as of right. The Islamic Center, which owns a building situated in a residential area immediately adjacent to property being used as a church by another faith, challenges the Board's refusal to permit it to use its property for public worship services. While the city ordinance restricts the use of any property in this type of residential area or in the City's commercial district as a church, 25 churches, all Christian, are located in similarly regulated areas. Sixteen of these churches occupied their present sites before the ordinance became effective, and nine moved in thereafter with the benefit of an exception. Only the Islamic Center has ever been denied an exception. Because the City has failed to establish that the Board of Aldermen based its denial of an exception to the Islamic Center on a sufficient reason or that it has not favored Christian churches over Muslim mosques, we hold the Board's action violates the free exercise of religion clause.

I.

Part of the campus of Mississippi State University, at which 11,663 students are enrolled, is within the eastern section of the city limits of the City of Starkville, Mississippi, and the remainder of the University campus is east of the City, which has a resident population of 15,169, only slightly more than the student population. Among the students at the University are a small number of Muslims, about 15 to 18 families, 35 to 50 individuals. The Muslim faith is demanding for the pious, requiring five prayers a day on a schedule fixed by the solar calendar: before sunrise, at noon, before sunset, after sunset, and when night has fallen. While the City urges that public performance of these prayers is not necessary, one of the few primary duties of the faithful Muslim is to say prayers at the prescribed times, preferably in a mosque or

*masjid,* a place of prostration.[1] Friday is a holy day, much like Sunday to Christians or Saturday to Jews, and all Muslim males should attend prayer in the mosque, where the imam, the religious leader, leads the prayers and delivers a midday sermon.[2]

There was no mosque at the University, so in 1977 the Muslim students formed the Islamic Center of Mississippi, Inc., to provide group worship opportunities to Muslim students and the few Muslim faculty members. In 1982, still lacking an established place for worship, members of the Islamic Center appointed a search committee to locate a building that they could use as a mosque. Because few of the Muslim students had cars, the committee sought a site within walking distance of the campus.

The search committee first located a building that might be suitable for Muslim worship at 212 South Nash Street, in Starkville. Knowing of the City's zoning ordinance, the chairman of the search committee, Mohamed Shwehdi, wrote to Larry Bell, the City's building codes official and its liaison representative with the Planning Commission, about the site. Bell told Shwehdi that the location would not be approved because of inadequate parking. The committee then wrote again, proposing a building at 525 University Drive, which appeared to have adequate space for parking and was located across the street from a church. The Planning Commission rejected the committee's request for permission to use this site because of the heavy traffic on University Drive. Shwehdi conferred with Bell informally from time to time about other sites. Bell informed him on each occasion that the site would not pass Planning Commission muster, so the Committee did not seek approval of these locations. In April, 1983, the Committee made its third written request, this time for permission to use property at the corner of Jarnigan Street and Lumas Drive, across the street from a church. Again Bell told Shwehdi that the use of this location for a church would not be approved because it created too much traffic congestion. The Islamic Center's proposal of a site at 523 University Drive met the same reception.

Shwehdi then met with Bell and the Planning Commission and asked "exactly where we can locate." Bell did not testify at the trial, but Shwehdi testified that at this meeting Shwehdi suggested a house situated at 204 Herbert Street, which is only slightly more than one block from the University campus. He testified that Bell responded, "excellent location. If you can buy it," believing that the property was not for sale. According to Shwehdi, the Commissioners agreed that if the Islamic Center could purchase the Herbert Street property and supply the parking the city ordinance required, they would recommend that the Board of Aldermen approve the site. Representatives of the Islamic Center sought out the owner and bought the property in September, 1983.

Pursuant to Bell's instructions, the Islamic Center then prepared a schematic drawing showing the location of the existing structure at 204 Herbert Street and the proposed parking area, 18 spaces. Shwehdi submitted this to the Planning Commission, which recommended approval. Shwehdi then went to the City office to obtain a building permit to make the necessary improvements. The person who issued permits at first refused his request because the building was not approved for congregational worship. Bell and the city electrical inspector instructed her to issue the permit, so she did, designating the use as "commercial," but the next day she telephoned Shwehdi and told him to return the permit. She then changed the specified use to "residential."

The City's zoning ordinance requires final approval by the Board of Aldermen of the use of property for a church when that use requires an exception to the provisions of the ordinance. Consequently, the Planning Commission submitted its recommendation to the Board for approval. On November 22, 1983, Shwehdi received a telephone call from a reporter who worked for

---

1. *Islam,* in Encyclopedia of Religion and Religions 198 (E. Pike ed. 1958).

2. *Id.* at 200.

a television station, informing him that the Board of Aldermen would consider the Islamic Center's request that evening and that, because of neighborhood opposition, the Board would likely reject the recommendation.

Shwehdi therefore attended the meeting. Bell recommended that the Board grant the exception, but a neighborhood resident, representing property owners in the area, spoke in opposition. According to the minutes of the meeting, the resident based his opposition on "congestion, parking, and traffic problems" in the neighborhood. The Board then voted unanimously to deny the exception without, so far as its minutes show, giving any reasons. Shwehdi asked to be heard, and the Board permitted him to make a statement, but this did not alter the Board's decision. The City did not communicate further with the Islamic Center, but thereafter the City's fire and electrical inspection officers inspected the building and approved its conformity with their requirements for a place for worship.

The Islamic Center made the proposed renovations to the Herbert Street building and began to use it as both a student residence and a place for worship. Seven months later, in June, 1984, City Manager P.C. McLaurin, Jr., wrote to Shwehdi stating that the neighbors were complaining about the use of the Herbert Street property. The Muslims received this letter immediately after Ramadan, the holiest month of the year in the Muslim calendar and the time of greatest activity at the Herbert Street Center. Shwehdi testified without contradiction that, in a conference with him and another member of the Islamic Center, McLaurin suggested that the Muslims "cool it down, be quite [sic].... He advised really to promote a good relation to the neighbors too."

On October 31, 1984, thirteen months after the Islamic Center had purchased the Herbert Street property and eleven months after the Muslims had completed both the renovations and the installation of off-street parking and started to gather for worship, the City ordered the Islamic Center to stop holding worship services there.

After this suit was filed, however, the City agreed to permit continued use of the Center for worship until the case is decided.

City Manager McLaurin described the neighborhood surrounding 204 Herbert Street as "a residential area undergoing a considerable amount of stress at the moment in the sense that you have had a transition from single family homes ... into multi-family, apartment development, duplexes, tri-plexes, this type of thing. Some would say a downgrading of the area." A commercial purveyor of take-out pizza and about 100 units of student housing are located in the vicinity.

The building at 204 Herbert Street is a modest frame structure that was used as a single-family residence before the Islamic Center bought it. A photograph introduced in evidence shows that it is a low-cost one-story residence and its exterior is in a poor state of repair. The Muslims presently use part of the building for worship services and part for housing students. Members enter through the rear door.

Next door to the Islamic Center is an impressive brick two-story building, graced by stately white columns and a broad veranda, once occupied as a fraternity house. This is now Maranatha House, a residence and worship center for a Pentecostal Christian denomination. Five more churches lie within a quarter mile of these two religious centers.

It is not clear from the record when the Maranatha House group began to occupy its Herbert Street property. While City officials have treated its use as if it were grandfathered in as a nonconforming use when the City adopted its original zoning ordinance in 1969, Pete Melby, a neighborhood resident who was called as a witness by the City, testified that the A.T.O. fraternity, not a church, occupied the building in 1969 when the original ordinance went into effect. Melby sought to distinguish Maranatha House on a basis not urged by the City: it is not a church because "it says on the sign" that Maranatha House is a student organization. However, worship services take place at Maranatha House on a

regular basis. Indeed, the most heavily attended services at Maranatha House attract more than twice as many persons as the most heavily attended services at the Islamic Center.

Maranatha House has only eight off-street parking spaces, while the Islamic Center provides eighteen off-street parking spaces for its smaller group. All of the Islamic Center congregants who have cars park in the parking spaces provided. Because Maranatha House has insufficient parking spaces, many persons who come to its services park on the streets and sometimes block the Islamic Center driveway.

The Muslim worship ceremony is not obtrusive. As the district court found, noise from services is not audible outside the Islamic Center, and neither singing nor amplified preaching occurs during the service. In contrast, the district court found, noise is often a problem during Maranatha House services due to the size of the congregation, which includes about one hundred members, the playing of tambourines and other instruments, and the use of amplifiers and loudspeakers in the course of preaching and singing.

The City adopted its zoning ordinance in 1969 and amended it in 1982. The earlier ordinance is not in the record, so we cannot determine the changes made by the 1982 amendment, but as amended, it provides for 14 types of districts. Five areas are classified R–E, Residential Estate Districts. The ordinance expressly permits property in R–E districts to be used as churches, but none of the City's 26 churches is located in any such district. Four of the five R–E districts are located at the western or northern edges of the City, all beyond easy walking distance of the University campus. The R–E district nearest the university is three miles away.

Until this action came to trial, the City had never interpreted the ordinance as permitting churches to be located anywhere except in an R–E district unless the Board granted an exception. At trial, however, City Manager McLaurin, based on his intention as one of the three persons who had prepared the ordinance, testified that he now interpreted it to allow churches in the C–3 Central Business District. While the district court accepted that nunc pro tunc interpretation, it does not conform to the ordinance, which provides that no use of property other than the types specified as "permitted" or "permitted as an exception" shall be allowed. The statement of uses permitted in R–E districts specifies that property may be used as a "church, but not including missions or revival tents." The "uses permitted" clause for C–3 districts, however, does not mention churches but only "[p]laces of amusement and assembly." Churches are not even mentioned in the C–3 "exceptions" clause, although residences are. On the other hand, the ordinance states that in R–1 Residential Districts churches are permitted as an exception, suggesting inferentially that they are not permitted in the C–3 district even as an exception.

The heaviest concentration of churches in Starkville is on the east side of the City, near the University campus. The land in the five R–E districts is largely undeveloped and includes considerable farm land. The part of the University campus beyond the city limits, however, is bordered on the east side, the side away from the City, by an unzoned county area in which some churches are located.

Excluding Maranatha House and the Islamic Center, 25 churches are located in the City. When the original zoning ordinance was adopted in 1969, sixteen were already established in areas zoned against such use, but a prior-existing-use clause in the ordinance allowed these to remain. Since 1969, nine churches have applied for permits, or exceptions, to allow their location in areas zoned against church use, and the Board has granted every one of the nine. In response to an interrogatory, "Have you ever denied a zoning exception to a religious group, except the plaintiff's association?" the City answered categorically, "No." The nine churches granted exceptions, the sixteen churches established before the 1969 ordinance, and Maranatha House all serve as worship centers for Christian denominations.

The Islamic Center contends that the zoning ordinance is invalid on its face because it forces Muslims to worship in the least acceptable parts of the City or in the county outside the City's boundaries, that the City's action in denying it an exception violates its members' right to free exercise of their religion, and that the Board's action was arbitrary, thus denying it and its members due process.

The City maintains that the ordinance does not inhibit the free exercise of religion because churches may be built either in the R–E districts or outside the city limits. It maintains that the Board's refusal to grant an exception for the Herbert Street location is based on a secular purpose, visiting only an incidental burden on religion. College View Street, which intersects with Herbert Street, is a main traffic artery to and from the University. It is 24 feet wide. Four-way stop signs mark the intersection of Herbert and College View. College View dead-ends at Nash Street, one block to the west of the intersection. An enormous amount of traffic turns onto Herbert Street from College View to gain access to U.S. Highway 82, which is located one long block to the north of the intersection. There are no sidewalks on Herbert Street, and on-street parking is not permitted. The Chief of City Police described the intersection of College View Drive and Herbert Street as a "hot spot" for accidents. A member of the Board of Aldermen testified that the Board denied the exception for the Islamic Center because of concerns about traffic congestion and neighborhood safety.

## II.

In the part of its opinion entitled "Conclusions of Law," the district court stated that "congregational prayer for Muslims is desirable, but not mandatory. The city ordinance ... does not infringe upon an individual's right or ability to turn toward Mecca and pray at the specified times during each day." The court also observed, "The Starkville city ordinance does not preclude students from purchasing cars and driving to a worship site located in an R–E district or walking to a site located in the Oktibbeha County section of land which is adjacent to the MSU campus' [sic] eastern boundary." This land is, of course, outside the Starkville city limits. The court dwelt upon whether, under *Monell v. Department of Social Services,*[3] the City might be held liable in damages for the acts of its agents, but the Islamic Center had dropped any claim for damages before trial and asked only for a declaratory judgment and that the City and its officers be enjoined from interfering with the use of the Herbert Street property as a mosque. Finally, the court concluded, "Standing alone, the denial of the Herbert Street zoning application is not enough upon which to base an inference of discrimination.... The actions of the Board were supported by valid traffic considerations, and there is no evidence to suggest that it improperly considered plaintiffs' religion in reaching its decision." Therefore the ordinance did not infringe upon the Islamic students' right to free exercise of religion. The district court then held the zoning ordinance had not violated substantive due process because it was a legitimate exercise of the City's police power, not clearly arbitrary or unreasonable and having a substantial relation to the public safety or general welfare.

## III.

Regulatory statutes or ordinances that affect religious activity are constitutional so long as they impose no undue burden on the ability of the church or its members to carry out the observances of their faith.[4] The district court's opinion and the City's brief both suggest that application of the zoning ordinance to the Islamic Center places no burden on it or its members because they can establish a mosque within walking distance of the campus outside the city limits or buy cars and ride to more distant places within the City. The suggestion is reminiscent of Anatole

---

3. 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

4. *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972).

France's comment on the majestic equality of the law that forbids all men, the rich as well as the poor, to sleep under bridges, to beg in the streets, and to steal bread.[5] Laws that make churches, synagogues, and mosques accessible only to those affluent enough to travel by private automobile obviously burden the exercise of religion by the poor, a class that includes many students.[6] And a city may not escape the constitutional protection afforded against its actions by protesting that those who seek an activity it forbids may find it elsewhere.[7] By making a mosque relatively inaccessible within the city limits to Muslims who lack automobile transportation, the City burdens their exercise of their religion.

The Constitution does not, however, forbid all governmental regulation that imposes an incidental burden on worship by making the free exercise of religion more difficult or more expensive. The government may subject individuals and religious organizations to religiously neutral regulation exercised for a secular governmental purpose, such as fire inspection, building, and zoning regulations.[8] Once it has been established that an ordinance burdens religious exercise, however, the government must offer evidence of an overriding interest to justify its application of the ordinance.[9]

As the Supreme Court observed in Schad v. Borough of Mount Ephraim, "The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits.' "[10]

Zoning is, of course, a valid exercise of a municipality's police power,[11] and courts accord such municipal decisions considerable deference.[12] When, however, a community's zoning plan infringes upon first amendment rights, we scrutinize its validity more closely, and mere rationality of the plan does not suffice: it must be narrowly drawn in furtherance of a substantial government interest.[13] We use this more stringent standard even when a challenged regulation restricts freedom of expression only incidentally or only in a small number of cases.[14] The same precept applies to an infringement of the free exercise of religion. When a zoning ordinance burdens religious use, "the deference normally due a legislative zoning judgment is not merited."[15] Indeed, the Sixth Circuit has held that, if a zoning ordinance infringes a free exercise right, the city must justify the ordinance by showing a compelling government inter-

**5.** A. France, Le Lys Rouge (1894), *quoted in* J. Bartlett, Familiar Quotations 655 (15th ed. 1980).

**6.** *But see Lakewood Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood,* 699 F.2d 303, 307 (6th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

**7.** *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 76–77, 101 S.Ct. 2176, 2186–87, 68 L.Ed.2d 671 (1981).

**8.** *Lemon v. Kurtzman,* 403 U.S. 602, 612–14, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971).

**9.** *Wisconsin v. Yoder,* 406 U.S. at 214, 92 S.Ct. at 1532; *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963); *Braunfeld v. Brown,* 366 U.S. 599, 607–09, 81 S.Ct. 1144, 1148–49, 6 L.Ed.2d 563 (1961).

**10.** 452 U.S. at 68, 101 S.Ct. at 2182 (quoting *Moore v. City of East Cleveland,* 431 U.S. 494,

514, 97 S.Ct. 1932, 1943, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring in judgment)).

**11.** *Star Satellite, Inc. v. City of Biloxi,* 779 F.2d 1074, 1079 (5th Cir.1986); *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1212 (5th Cir.1982).

**12.** *Village of Belle Terre v. Boraas,* 416 U.S. 1, 4, 8, 94 S.Ct. 1536, 1538, 1540, 39 L.Ed.2d 797 (1974).

**13.** *Schad,* 452 U.S. at 68, 101 S.Ct. at 2182–83; *Star Satellite,* 779 F.2d at 1079; *cf. Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 335 (5th Cir. Unit B Nov. 1981).

**14.** *Schad,* 452 U.S. at 68 n. 7, 101 S.Ct. at 2183 n. 7.

**15.** *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 122, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982).

est.[16]

■ The assembly of a community of believers is an integral part of most religious faiths, certainly of the Muslim. The assembly of those bound by common beliefs and observances not only serves to create a sense of community among the members through the shared expression of their beliefs, it also communicates to outsiders the church's identity as a group devoted to a common ideal. By group worship, each worshipper communicates to outsiders the identity of the group and his own identity as a member of it, a form of self-expression.[17] Ritual preserves, evidences, and perpetuates faith. If government exercises its power to affect group worship, it must demonstrate at least that the burden imposed serves an important government purpose and also that this purpose could not be accompanied by a means less burdensome to the exercise of religion.

As the Supreme Court observed in *Schad,* the availability of other sites outside city limits does not permit a city to forbid the exercise of a constitutionally protected right within its limits. "[One] is not to have the exercise of his liberty of expression [and, we add, his freedom of religion] in appropriate places abridged on the plea that it may be exercised in some other place." [18]

Judicial scrutiny of the exercise of municipal zoning when zoning encroaches on the free exercise of religion employs more demanding criteria than review for conformity with due process. When only the

right to due process is invoked, the exercise of zoning power "should seldom be the concern of federal courts." [19] Therefore, "[i]n the absence of ... infringement of fundamental interests, our review of these quasi-legislative decisions is confined to whether the decisions were 'arbitrary and capricious.' " [20] When, however, the exercise of this power burdens fundamental constitutional rights such as freedom of expression or free exercise of religion, judicial review is more stringent and the government that imposes the limitation bears the burden of justifying its necessity.

Many state courts have therefore held that a zoning ordinance that prohibits the construction of church buildings or the use of all existing buildings for public worship in virtually all residential districts violates the free exercise clause.[21] The majority of these state court decisions have held that municipalities may not completely exclude facilities for religious use from such districts,[22] although in many of these cases there was a justification other than free exercise for the invalidation of the ordinance.[23] Whether the constitutional guarantee is so extensive we need not now consider. The question before us is more limited: whether the City's refusal to grant an exception to permit use of the Herbert Street property for religious worship is supported by important government needs and, if so, whether the City has enforced its secular interests uniformly in dealing with other religions.

Few federal courts have considered this issue. In *Lakewood Congregation of Je-*

**16.** *Lakewood Congregation of Jehovah's Witnesses,* 699 F.2d at 308–09.

**17.** *See* Comment, *Zoning Ordinances Affecting Churches: A Proposal for Expanded Free Exercise Protection,* 132 U.Pa.L.Rev. 1131, 1149–51 (1984).

**18.** 452 U.S. at 76–77, 101 S.Ct. at 2187 (quoting *Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939)).

**19.** *Shelton v. City of College Station,* 780 F.2d 475, 477 (5th Cir.) (en banc), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 107 S.Ct. 89, 91 L.Ed.2d 566 (1986); *cf. Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

**20.** *Shelton,* 780 F.2d at 477.

**21.** *See* Reynolds, *Zoning the Church: The Police Power Versus the First Amendment,* 64 B.U.L. Rev. 767, 775–76 (1985) (citing cases); Comment, *supra* note 17, at 1136 n. 27 (1984); *see generally* R. Anderson, American Law of Zoning 3d § 12.22 (1986).

**22.** Reynolds, *supra* note 21, at 775 (citing authorities); Comment, *supra* note 17, at 1137.

**23.** Reynolds, *supra* note 21, at 776–77, 782–83 & n. 89; Comment, *supra* note 17, at 1136–40.

*hovah's Witnesses*,[24] the Sixth Circuit employed a two-step analysis to determine whether the ordinance infringed the right to free exercise of religion. First, it evaluated the nature of the religious observance at stake. Although the church owned the property in question, it had not yet built on the site, so the court classified the religious observance in question as the construction of a building in a residential district, distinguishing this from the use of an existing building for worship. Next, the Sixth Circuit identified the nature of the burden placed on the religious observance. Residential districts constituted ninety percent of the area of the city. The court found that, although the ordinance allowed the congregation to construct a new building only in the remaining ten percent of the city, the record did not show that the congregation might not purchase an existing church or worship in any existing building in the ninety percent of the city in which it might not build. Nor did the record contain any evidence that travel to worship in any of the areas concerned would impose any hardship on the members of the religious faith involved. The sole burdens identified were economic, in that land might cost more in some areas than others, and aesthetic, in that the religious group did not have wholly unrestricted options in choosing its place of worship. The court concluded that the city ordinance did not exclude the exercise of religious freedom or impose more than an incidental burden on worship. Because the Sixth Circuit found no infringement of religious freedom,[25] it reviewed the ordinance under the more deferential due process standard.

The Eleventh Circuit, in *Grosz v. City of Miami Beach*,[26] balanced the city's interest in enforcing its zoning law against the burden the law imposed on the free exercise of religion. The city sought to enforce an ordinance that prohibited churches, synagogues, and similar religious congregations in single-family residential zones. The ordinance expressly listed churches and synagogues as permitted uses in many other residential zones, constituting at least fifty percent of the city's territory, and the city permitted religious institutions to operate freely in all zones except those designated for single-family residential use. The city asserted an interest in enforcing the ordinance to avoid spot zoning, to preserve a coherent land use plan, and to preserve the residential quality of the single-family residential zones by protecting the residents from traffic, noise, and litter problems. Grosz sought to use a converted detached garage adjacent to his home in a single-family residential district for religious services held twice daily for a congregation of at least ten adult males. Sometimes as many as 50 people attended. The parties stipulated that Grosz was not immobile and that he could conduct the group religious services his faith demanded in many other areas within the city, including an area within four blocks of his home. The court observed that Grosz could conform his conduct to the law either by conducting services in a suitably zoned area, as close as four blocks away if he chose, or by making his home elsewhere in the city, more than half of the territory of which was open to such activity.[27]

The court acknowledged that such a location change would have some impact on Grosz in terms of convenience, dollars, or aesthetics, but concluded that this burden was relatively light.[28] It recognized that allowing the religious observances to continue would substantially infringe the city's zoning policies,[29] and held that the burden on the government if the conduct continued outweighed the burden upon Grosz's free exercise interest if the ordinance were enforced. It therefore upheld the ordinance as applied.[30]

**24.** 699 F.2d 303.

**25.** *Id.* at 308.

**26.** 721 F.2d 729 (1983), *cert. denied,* 469 U.S. 827, 105 S.Ct. 108 (1984).

**27.** *Id.* at 739.

**28.** *Id.*

**29.** *Id.* at 741.

**30.** *Id.*

Summing up these decisions, one author writes:

[T]he recent federal appellate court decisions clearly stand for the proposition that zoning ordinances which serve a legitimate public purpose by excluding from certain residential areas church buildings or regular worship services in homes do not violate the First Amendment where such ordinances place *only* an "incidental economic burden" on religious freedom *and* where alternative channels and opportunities are left open for religious conduct.[31]

The burden placed on relatively impecunious Muslim students by the Starkville ordinance is more than incidental, and the ordinance leaves no practical alternatives for establishing a mosque in the city limits. There is no other place in the City within reasonable distance from the campus where the students may establish a place of worship, and the ordinance forbids the use of property they already own for worship services.

The City's approval of applications for zoning exceptions by other churches suggests that it did not treat all applicants alike. This undermines the City's contention that the Board denied a zoning exception to the Muslims solely for the purposes of traffic control and public safety.

The City has never enforced its ordinance against Maranatha House, with a membership twice as large as the Islamic Center, even though its services are audible from the street, it has only half as many parking spaces as the Islamic Center, and it is located on the same allegedly congested street next door to the Islamic Center. The City has not apparently interfered with parking of cars on the street by those attending Maranatha House, although it argues that on-street parking is not permitted on Herbert Street.

While lines must be drawn at some point, and, when traffic is congested, a few more cars may aggravate a bad situation, just as a final straw may break a camel's back, the City has advanced no rational basis other than neighborhood opposition to show why the exception granted all other religious centers was denied the Islamic Center. As the Supreme Court observed in *City of Cleburne v. Cleburne Living Center*,[32] an equal protection case, neighbors' negative attitudes or fears, unsubstantiated by factors properly cognizable in a zoning proceeding, are not a permissible basis for treating a home for the mentally retarded differently from other group or multi-unit housing institutions. There is even less justification for differentiating between familiar and unfamiliar religions. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." [33]

Professor Laurie Reynolds has suggested that courts should require that ordinances requiring special use permits or exceptions for the use of property as churches contain specific, religiously neutral standards to reduce the likelihood of abuse and to require uniformity in the allocation of burdens on religious applicants.[34] It is not necessary for us to go so far. The record makes it clear that the City did not act in a religiously neutral manner when it rejected an exception for the Islamic Center.[35]

The record compels the conclusion that the Board of Aldermen denied an exception to the Islamic Center for reasons other than considerations of traffic control and

**31.** Ziegler, *Local Land Control of Religious Uses and Symbols,* 1985 Zoning and Planning Law Handbook 331, 344 (J. Gailey ed. 1985) (emphasis added).

**32.** 473 U.S. 432, 447–49, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985).

**33.** *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).

**34.** Reynolds, *Zoning the Church: The Police Power Versus the First Amendment,* 64 B.U.L. Rev. 767, 769, 786–89 (1985).

**35.** *See id.* at 809; *Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); *see also Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *Cantwell v. Connecticut,* 310 U.S. 296, 304–06, 60 S.Ct. 900, 903–04, 84 L.Ed. 1213 (1940); *Schneider v. New Jersey,* 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939).

public safety and that it applied different standards to approving a Muslim mosque than it had adopted for worship facilities of other faiths. Moreover, the City has failed to show the importance of its purpose or that it could not have been accomplished by means less burdensome to the Muslim faithful.

For these reasons the judgment is REVERSED. This Court declares the ordinance unconstitutional as applied to the Islamic Center and enjoins the City of Starkville from enforcing the ordinance against the use of the property at 204 Herbert Street for public worship.