**Yavorhi CAM, et al., Plaintiff,**

v.

**MARION COUNTY, OREGON, Defendant.**

**Land Conservation and Development Commission, Defendant–Intervenor.**

**No. CIV. 96–6004–TC.**

United States District Court, D. Oregon.

Sept. 25, 1997.

James M. Brown, Enfield Guimond Brown & Collins, Salem, OR, Richard C. Stein, Ramsay & Stein, PC, Salem, OR, for Plaintiffs.

Michael J. Hansen, Gloria M. Roy, Marion County Counsel, Salem, OR, William F. Cloran, Denise G. Fjordbeck, Asst. Attys. Gen., Dept. of Justice, Salem, OR, for Defendants.

*ORDER*

COFFIN, United States Magistrate Judge.

Presently before the court is defendant Marion County's motion (# 22) for summary judgment, defendant LCDC's motion (# 23) for summary judgment, and plaintiffs' motion (# 27) for summary judgment.

*A. FACTUAL BACKGROUND*

This case involves a clash between plaintiffs' desire to exercise their religion and government's desire to regulate land use in an agricultural area.

Plaintiffs are all members of the Russian Old World Believers Church. An orthodox Christian group, the Old World Believers fled the then Soviet Union because of religious persecution, moved first to Turkey, then to Brazil, and finally the United States.

Settling in Oregon in 1965, the Old World Believers purchased land in Marion County. Over time, a village evolved on the property,

and a church (the Pokrov Church) was built in the center of the village.

The Pokrov Church building is approximately 26 feet by 70 feet in its dimensions. In 1994, the Fire Marshal placed a limit of 270 people in occupancy of the Pokrov Church building at any one time. At present, total membership of the Pokrov Congregation is approximately 448 people.

Church attendance is a central part of the life and culture of the Old World Believers. Church services are frequent and lengthy (e .g., 7½ hours of services on Sunday, interspersed throughout the day).

In 1994, approximately 100 Church members began attending church services inside an agricultural building approximately 800 feet from the Pokrov Church. This building and the land it occupies is owned by plaintiffs Yavorhi and Nastuka Cam, who also own the Pokrov Church building and its land. The agricultural building was blessed and approved as the new "Uspenia Church" by a faction of the Old World Believers Church, and plaintiffs have been conducting worship services at this site ever since.

Marion County discovered that plaintiffs were praying in an agricultural building and demands that they cease and desist. To the county, and also to the state (which intervened on behalf of the county), the Uspenia Church building had been approved for use only as an agricultural building (the Cams had received a county permit approving the building as an "agricultural structure"[1] in 1993) and using the building for church services necessitates a new "conditional use permit" authorizing such use.

Thus on September 27, 1994, Marion County Building Inspector Supervisor H.L. Stone sent the following letter to Cam:

A site inspection was made at the following location on August 5, 1994. At that time a Marion County Building Inspector posted a notice to contact the Building Inspection Division, and obtain a permit by August 20, 1994 for the building.

---

1. When Yavorhi Cam constructed the metal shed at issue here, he intended to use it to store boxes and pallets for blueberry plants.

Failure to obtain a building permit prior to construction is a violation of Marion County Ordinance No. 881. Efforts to gain compliance have failed, therefore an *INVESTIGATION FEE* has been assessed in addition to the required permit fees.

Proper permits must be obtained, or the building must be removed **no later than October 15, 1994.** I have enclosed copies of the required permit application(s) and site plan. You will also need to indicate on the enclosed site plan the distances between the proposed structure and the property lines. Please sign and return with payment.

Failure to comply by this date may result in the issuance of a $100.00 per violation, per day citation and/or possible further enforcement measures.

On October 14, 1994, Cam responded by submitting an application for permission to use his previously-approved farm building as a "church." Obtaining the state's permission to pray in a pre-existing building is expensive: When Cam had sought approval for the shed as an "agricultural" structure, no fee was assessed. When he sought approval to use the same structure as a "church," he was assessed fees of $1,204.50, which included a "building" fee of $438, "doubled" by another $438 fee because of the Inspector's investigation into the unauthorized use of the farm building as church.

Cam's application was denied. The following are pertinent excerpts from the Hearing's Officer's findings and decision:

2. *Under MCZO 119.070, before granting a conditional use, the Hearings Officer must determine:*

(a) *That the Hearings Officer has the power to grant the conditional use;*

(b) *That such conditional use, as described by the applicant, will be in harmony with the purpose and intent of the zone;*

(c) *That any condition imposed is necessary for the public health, safety or welfare, or to protect the health or safety of persons working or residing in the area, or for the protection of property or improvements in the neighborhood.*

3. *Under MCZO 119.030, the Hearings Officer may hear and decide only those applications for conditional uses listed in the MCZO. MCZO 136.030(x) lists expansion of a lawfully established church, meeting the criteria in MCZO 136.040(d), as a conditional use in the EFU zone.*

4. *Opponents assert that the Hearings Officer has no authority to grant this request. Opponents claim that the requested facility is not an expansion of an existing church, but is a new church altogether. New churches are not allowed in the EFU zone under the MCZO. In addition, the Planning Division contends that the term expansion does not include building on a noncontiguous parcel.*

5. *Applicants claim that the people who attend the Uspenia Church are all members of the Pokrov Church, that the church membership has outgrown the capacity of its current structure, that there is no room for expansion on site, and that the church must expand off site. Opponents contend that the people who attend the Uspenia Church have split from the Pokrov Church and formed a new Church which is not allowed in the zone.*

6. *The Pokrov Church was established in the Bethlehem subdivision in the 1960s and is a lawfully established church. The church lists a membership of about 428. Approximately 111 of those people are now aligned with the Uspenia Church. The people are all of the same faith and the churches practice the same rituals. The capacity of the Pokrov Church building is about 270. Services are offered at various times during the weekend. The main problem with overcrowding occurs at Christmas and Easter, when more people than usual attend services. Conflicting testimony was presented about the circumstances prompting the move to the 7.19 acre parcel.*

7. The applicant contends that Uspenia is a part of the Pokrov Church and that overcrowding is the issue at hand. Opponents contend that a rift developed between church members after a new pastor was chosen by the church membership last year. Opponents claim that after Mr. Cam was defeated in the church election, the Cams broke away from church and Mr. Cam started his own church on the 7.19 acre parcel. This parcel is over 800 feet from the other church site.

8. An expansion of a facility indicates some kind of harmony of agreement that the expansion is necessary. No such harmony or agreement exists between those who attend the Pokrov Church and those who attend the Uspenia Church. The churches are variously referred to as "our" church and "their" church by both sides at different times. There was no evidence of cooperation between the churches, of a single management of both facilities, or that one pastor ultimately answers to the other. The Uspenia Church grew out of the Pokrov Church, but there are now two sides in this matter, a dispute, a conflict. A council of member churches of the Old World Believers met to resolve the issue. The council supports the existence of the Uspenia Church, but the dispute between the parties is still not resolved. The church is split. This is not a church expansion.

9. The Hearings Officer has no authority to determine this matter because the proposal will create a new church in the EFU zone.

10. The Hearings Officer also finds that the expansion of a facility does not include the establishment of a new facility on a noncontiguous parcel. For example, a potato processing plant might operate as a commercial activity in conjunction with farm use on a small parcel in the EFU zone. The plant might reach processing capacity at its current site and the plant operator may want to move some of the storage or processing off site. The off-site use might expand the existing operation, but the use is new to the parcel. Expansion does not include the establishment of a new facility at a noncontiguous site. The proposed use is not an "expansion." The Hearings Officer has no authority to determine this matter because the proposal will not expand a church in the EFU zone.

11. An analysis of the criteria for expansion of a lawfully established church is offered by the Hearings Officer should it be found during any appeal of this decision that this is an expansion of an existing church and that jurisdiction exists.

12. MCZO 136.040(d) contains the following compatibility and service criteria:

   1. The use will not force a significant change in, or significantly increase the cost of, accepted farm or forest practices on the surrounding lands devoted to farm or forest use.

   2. Adequate fire protection and other rural services are, or will be, available when the use is established.

   3. The use will not have a significant adverse impact on watersheds, groundwater, fish and wildlife habitat, soil and slope stability, air and water quality.

   4. Any noise associated with the use will not have a significant adverse impact on nearby land uses.

   5. The use will not have a significant adverse impact on potential water impoundments identified in the comprehensive plan, and not create significant conflicts with operations included in the comprehensive plan inventory of significant mineral and aggregate sites.

13. The proposed church building exists. the church will take some on-site land out of agricultural production, but the building is well insulated by distance and intervening structures from neighboring agricultural uses to

the north. The church is insulated from neighboring agricultural uses to the west and south by the size of the subject parcel. The church is separated from the agricultural use to the east by the subject property and Miller Road, a distance of approximately 200 feet, the setback requirement for nonfarm dwellings in the EFU zone. The proposed use will not be occupied on a daily basis. The proposed use will not force a significant change in or significantly increase the cost of farming practices on surrounding lands devoted to farm use. None of the surrounding lands are in forest use. MCZO 136.040(d)(1) id satisfied.

14. The subject property is located within the Woodburn fire district and must meet all fire district requirements to ensure that adequate fire protection is available. This can be a condition of approval. Any approval of the conditional use would also require that a septic system evaluation as a condition of approval to ensure that adequate subsurface sewage disposal is available. Water is available to the site from an existing well. Electricity and telephone service are available to the Bethlehem subdivision. The application, if condition, could meet the requirements of MCZO 136.040(d)(2).

15. The subject property is not located in an identified watershed, flood plain. geologic slide hazard, or fish and wildlife habitat area. The proposed activities for the subject property will not emit noxious odors or particulate matter into the air. As noted above, a septic system evaluation will protect area groundwater. The application, if conditioned, could meet the requirements of MCZO 136 .040(d)(3).

16. No significant noise will be associated with the proposed conditional use. MCZO 136.040(d)(4) is satisfied.

17. No potential water impounds have been identified in the MCCP and no significant mineral aggregate sites have been identified in the area of the subject property. MCZO 136.040(d)(5) is satisfied .

18. Although the application can meet the compatibility and service criteria of MCZO 136.040(d), the application must be dismissed due to a lack of jurisdiction.

VI. Order

It is hereby found that the proposed use is not an expansion of an established church and that the Hearings Officer lacks jurisdiction to hear and decide this matter. Therefore, it is ordered that application for conditional use is dismissed.

In sum, then, the Hearings Officer denied the application (on the ground that she lacked jurisdiction to entertain it) because she found that the proposed use was not an expansion of the Pokrov Church, but was instead the creation of a "new" church, in schism from the Pokrov Church. The Hearings Officer further determined that, had the Uspenia Church been found to be an expansion of the Pokrov Church, its use as a place of worship would not present a significant impact on farm use nor be incompatible with other relevant permit criteria.

The Hearings Officer has reconsidered this matter twice since the initial order dismissing the Cams' conditional use application, but has reached the same result each time. It is noteworthy that the "Pokrov Church" retained counsel and appeared throughout the Marion County hearings in steadfast opposition to the "Uspenia Church's" application. The essential theme of the Pokrov Church's opposition was that the Cams and their followers were in schism with the Pokrov congregation, and were seeking to establish a "new" church. To quote from one of the Pokrov submissions to the Hearings Officer:

This case is not about an expansion of an existing lawfully established church in an EFU zone. This case is about a church split on a disagreement over who had control and direction of the Pokrov Church. This Hearings Officer has no jurisdiction

to hear this matter and as such this request must be denied.

April 19, 1995 Opponents' Record Response.

The final order of the Hearings Officer dismissing the Cam's application, dated April 30, 1997, confirmed this reasoning:

11. Under OAR 660–33–120, establishment of a church is not allowed on high value soil, but, under OAR 660–33–130(18), an existing church on high value soil may be expanded. Under OAR 660–33–120, a church may be established on nonhigh value soil unless it is located within three miles of an urban growth boundary (UGB). Under OAR 660–33–130(2), an exception under ORS 197.732 and OAR 660–04 is required to place a new church within three miles of a UGB.

12. The subject property is made up of high value agricultural soils and is located within three miles of an urban growth boundary. The proposed use is an establishment of a new church on high value soils, and cannot be approved under OAR 660–33.

### B. STANDARDS

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "enti-

tled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *Id.* at 323, 106 S.Ct. at 2553. There is also no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Taylor v. List*, 880 F.2d 1040 (9th Cir.1989).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Insurance Co. of North America*, 638 F.2d 136, 140 (9th Cir.1981).

### C. DISCUSSION

However unintended, the county's application of land use regulations to refuse permission for the Cams to worship in a pre-existing farm building has resulted in the government favoring one religious sect over another and in the denial of rights secured to plaintiffs by the First Amendment of the United States Constitution. Further, it cannot be fairly said that any legitimate or rational, much less compelling, state interest has been advanced by such application of the Oregon Land Use Regulations.

It is noteworthy that the building now used by the Cams and their followers as a place of worship was approved by Marion County as an agricultural structure before plaintiffs began praying in it. The county and the state do not contend that the Cams applied for a permit to build a "farm" building as a ruse, when all along they really wanted a "church" building. A building—intended to be used to store tractors and

blueberry pallets—thereafter was used for liturgical services when a rift or schism developed in the Pokrov congregation. The farm building was blessed in a religious ceremony, icons instead of farm equipment were stored, and the people began gathering on a regular basis inside the building to pray to their God.

As far as the state is concerned, whatever impact the building had on high value farmland occurred when it was first built. Whether the plaintiffs store pallets, tractors, or Bibles and sacred relics inside the building no longer matters in terms of the impact the building has on the land it occupies. The Hearings Officer expressly found that the use of the building as a church would not present any significant impact on farm use or farming practices in the area.

Although certainly there is now "public use" of the structure, whereas none was contemplated when the farm building permit was issued, the Hearings Officer did not deny the Cams' application because of this or related factors. To the contrary, in her order she noted that the Cams' application could be granted conditionally on meeting fire district and other requirements pertaining to public occupancy.

The church-state conflict here may be subtle, but a full analysis of this issue presents grave implications in a country where religious freedom is so cherished. The ultimate question posed is whether the state[2] may prohibit people from praying inside a farm building, where the act of praying does not impact upon any secular state interest. A parallel question is whether one religious sect may avail itself of the powers of the state to preclude another sect from conducting rival prayer services.

As previously described, "Uspenia Church" services are conducted in a farm building that Cam built with a valid permit. After the Uspenia congregation began meeting in the building to pray, the building inspector made an on-site inspection. Although the record is not entirely clear, there is a strong inference that the inspector's visit was prompted by a Pokrov Church member's complaint. The August 5, 1994 inspection report reflects the heading "Complaint 93–2952",[3] and the inspector notes: "Bldg. Church w/out Permit—Posted Mandatory to obtain permit or provide verification of building as farm exempt use."

█ The "church" was not, however, built without a permit. The building itself was constructed with a permit, as an approved agricultural structure. What happened thereafter is that church members began gathering at the site to pray, blessed the building as a sacred place of worship, and so "converted" the building into a church.

In the eyes of the state, the conversion of the building required a new building permit. But it is simply inaccurate to allege that the "church" (meaning the building) was constructed without a permit. And H.L. Stone—the building inspector supervisor who authored the September 27, 1994 letter to Cam—was off the mark when he admonished Cam that the "failure to obtain a building permit prior to construction is a violation of [a] Marion County Ordinance."

What this case really involves is a far deeper issue than the simplistic one offered by the state. While the state may apply zoning laws and building regulations in neutral fashion to churches as well as homeowners, businesses, farmers, golf courses, schools, and so forth, it is a much different task to discern whether a structure that is allowed to be built by the state for agricultural purposes must be dismantled because people thereafter begin meeting in it to pray.[4]

2. In this context, the term "state" encompasses both the State of Oregon and Marion County.

3. 93–2952 was the site number for the agricultural structure for which Cam had previously received a permit.

4. At the hearing on the motions, the county stated that it was not seeking an order requiring plaintiffs to dismantle the building. Trans.

(#51) at p. 24. However, Building Inspector Stone notified Cam that the building "must be removed" in the absence of the proper permits. Furthermore, the plaintiffs have blessed the building as a church; and the state concedes it would violate their religious doctrine to revert the building to a secular use. Trans. (#51) at p. 21–22. Ordering the plaintiffs to cease using the barn as their "church" would simply result in an

If the Cams and some of their neighbors congregated inside the barn to discuss farming practices, or gathered every Saturday evening for square dancing, no additional permit would appear to be necessary.[5] But because they meet to worship, and because the barn has been blessed as a church, they are now required by state regulation to obtain a permit for a church.

The regulatory scheme has an interesting background. Although the Oregon Legislature specifically authorized counties to permit churches on EFU land [ORS 215.283(b)], the Land Conservation and Development Commission (LCDC) enacted agency rules that expressly *prohibit* new churches from high value agricultural zones. OAR 660–33–120. The Oregon Supreme Court has upheld the more restrictive agency rules, as being within the scope of the authority of LCDC, finding that the legislature did not intend the county's authority to permit certain non-farm use to be superior to LCDC authority to restrict those uses. *Lane County v. LCDC and 1000 Friends of Oregon*, 325 Or. 569, 942 P.2d 278 (1997).

The decision of the Oregon Supreme Court is binding and conclusive on the issue of the validity of the regulatory scheme pursuant to state law. Nonetheless, this court must consider whether the regulations as applied survive constitutional scrutiny.

The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment,[6] provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..."

As noted in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993) (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)):

In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.

The first question to be addressed is whether the challenged regulation is "neutral and of general applicability."

■ Clearly the regulation at issue possesses the requisite "facial" neutrality, in the sense that it does *not* refer "to a religious practice without a secular meaning discernable from the language or context." *See id.* at 533, 113 S.Ct. at 2226. But, the inquiry does not end at a facial review:

Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders."

*Id.* at 534, 113 S.Ct. at 2227 (citation omitted).

■ The court is also mindful that "in circumstances in which individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of "religious hardship" without compelling reason.'" *Id.* at 537, 113 S.Ct. at 2229. Further, government may not apply its laws to treat some religious denominations more favorably than others without violating the Establishment Clause, *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); nor "lend its power to one or the other side in contro-

empty barn. How does this help advance any legitimate state interest? The net result to the state is the same regardless of whether the Cams are successful in getting state approval to use the building as a church—either way it will not be used as a barn.

5. Again, the state does not contest the Cams' use of the building on issues of safety relating to

public occupancy, and the Hearings Officer found that the use of the building as a "church" could be conditioned on meeting all fire marshal requirements.

6. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

versies over religious authority or dogma." *Smith,* 494 U.S. at 877, 110 S.Ct. at 1599.

Applying these concepts to the facts of the instant case, I cannot find the regulations at issue to be "neutral" as applied to plaintiffs.

The state's application of the regulations to bar Uspenian services in the Cams' barn clearly has the effect of lending the power of the state to the Pokrov congregation in the controversy between the two factions. The Hearings Officer waded into the midst of the controversy when she applied the zoning regulations to deny the permit because the Uspenians were a "new" church, in disharmony with the "lawfully established" pre-existing Pokrov Church. Had the Pokrov congregation desired to "expand" so as to conduct services in the Cams' barn there is the strong likelihood that such would have been approved. Although the Hearings Officer made an alternative finding in her original order that an "expansion of a facility does not include the establishment of a new facility on a noncontiguous parcel," the regulations do not so define or limit the term "expansion."[7] The Hearings Officer's brief suggestion in that regard must be considered dicta, especially in view of the Hearings Officer's subsequent orders when she reconsidered the application. On February 11, 1996, the Hearings Officer expressly stated that she found "no reason to overrule the previous finding that the subject church is a *new* church and not an expansion of an *existing* church." (emphasis added). The Hearings Officer further found that the proposed use would be "an allowed use in the EFU zone" were it found to be an expansion of the Pokrov Church. Coupled with the Hearings Officers findings that the proposed use would not significantly impact farming practices, there is reason to conclude that an application by the Pokrov faction would have achieved a different result.

■ Further, as held in the *Church of the Lukumi Babalu Aye,* "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the command of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests .... A law that targets religious conduct for distinctive treatment or advances legitimate governmental interest only against conduct with a religious motivation will survive strict scrutiny only in rare cases." 508 U.S. at 546, 113 S.Ct. at 2233.

As previously noted, the "church" building was approved as a farm structure prior to the Uspenia congregation's use of the building for prayer services. Had the plaintiffs misrepresented the purpose of the structure when applying for the initial permit, the permit would have been the product of fraud and thus void. *Cf. Grosz v. City of Miami Beach, Fla.,* 721 F.2d 729 (11th Cir.1983). But that is not what happened. A state-sanctioned barn was thereafter used as a "church" because the Uspenian congregation split from the Pokrov congregation.

The regulations specifically prohibit public or private schools, churches and cemeteries, private parks, playgrounds, hunting and fishing preserves, campgrounds, and golf courses on high-value farm lands. Conversely, the regulations permit dwellings "customarily provided in conjunction with farm use" and "[o]ther buildings customarily provided in conjunction with farm use."

The Cams' barn was approved as a building customarily provided in conjunction with farm use. The state now purports to have it removed because it is being used for religious purposes. The state does not point to any legitimate concerns about public occupancy of the building, but rests its case solely on the fact that the building is being used for a forbidden purpose—i.e., the practice of plaintiffs' religion. It does not matter to the state's analysis whether there are five or 100 worshipers at the site. What matters is only that regular prayer services are being con-

---

7. "Expand" means "to spread" or "extend"; "to make greater in size." Webster's New World Dictionary, 3d College Ed. A school is "expanded" when it adds classrooms to its campus, even if the classrooms are not interconnected and are spread over hundreds of acres. Similarly, the Pokrov Church could be expanded by the acquisition of another building a few hundred feet away for worship services.

ducted, and that new "churches" are forbidden on high-value farmland.

It is problematic that the regulations do not address the issue of post-permit uses which will operate to negate the permit. A farmer, desiring to live on the family farm, obtains a permit to build a farm home. The family lives in the house and tills the soil. This is certainly a "dwelling customarily provided in conjunction with farm use." If the farmer thereafter invites ten of his neighbors over for Wednesday evening Bible study, does he need the state's permission?[8] Is the house subject to demolition because it is being used for a religious purpose, and such is not "customarily" associated with farm use?

Yet regular secular social gatherings would clearly not run afoul of the state's regulatory scheme. *See* OAR § 660–33–135(7). A weekly poker game involving the same neighbors is not a prohibited use of high-value farmland. *See* OAR § 660–33–120, Table 1. Presumably, Saturday night square dances in the barn would survive scrutiny by the building inspector of the type of use that is customarily associated with a farm building.

Wherein lies the authority for the building inspector to shut down a building because, in the eyes of the state, it has become a "church?" In the first place, the regulations do not define the term "church." While on the facts of this case, it may easily be said the Cams are using the building as their church, it is by no means clear where the farmer crosses the line with a religious use of a secular building. Nor are there any standards governing the inspector's exercise of discretion in this area. The order of the Hearings Officer is particularly instructive on this troubling issue:

> 6. Under MCZO 110.680, the Building Official or other designated officer, prior to issuing any permit pertaining to the use of land or structures, or the erection or alteration of any structure, shall ascertain that the purposed use

or construction shall in all ways conform to MCZO requirements.

> The Planning Director shall handle all matters pertaining to zone changes, variances, and conditional uses, and other administrative matters as prescribed by the MCZO; and such other matters as directed by the Planning Commission or Hearings Officers.

> The Planning Director shall determine whether dwellings or other structures are in conjunction with farm or forest use when such uses are permitted uses in the applicable zone. The administrative review procedures shall be followed in making these determinations. The same process shall be used for other administrative reviews under the MCZO, including modifications of special setbacks.

> Applicants argue there is no specific grant of authority to consider an administrative review to determine whether the proposed use is an allowed use in the EFU zone, and, since there is no authority for such review, no review is allowed. The Building Official must ensure that uses comply with the MCZO. In practice, this is done by having the Planning Division "sign off" on building permits. The sign off can be as simple as an over the counter determination made by Planning Staff that a use is permitted in the zone, or as complicated as securing a conditional use permit, zone change, comprehensive plan amendment or other land use action. An "administrative review" is the title given to the process by which the Planning Director takes a formal look at a proposed use and renders a written decision on whether it is permitted in a particular zone. A decision approving a use gives rise to notice and opportunity for a hearing. The grant to the Planning Director is specific in some instances (farm dwelling determinations, special setback reviews, etc.). The grant

---

8. At the hearing, the state contended that regular prayer services at a farm dwelling would be a permissible use, but that an "agricultural building" had to be exclusively devoted to a farming purpose. The court finds nothing in the regulations that distinguishes between a farm dwelling and an agricultural building regarding this issue. As noted, *infra*, the regulations nowhere define the term "church." A dwelling used for regular prayer services can be deemed a church as easily as a barn.

is not as specific in other cases (limited uses, MCZO Chapter 125). The key is that the director exercises some discretion in making a decision in these cases. The exercise of discretion requires notice and an opportunity to be heard. (See *Doughton v. Douglas County,* 82 Or.App. 444, 728 P.2d 887 (1986).) In Marion County, the administrative review procedure is the vehicle for providing notice and an opportunity to be heard.

After "sign off," what guides the Building Official in the exercise of his discretion as to what level of religious activity represents crossing the threshold into the forbidden territory of use as a church? There simply are no standards.[9] It is unfathomable that, in a country which so zealously protects freedom of religion, a state official can be given virtually unfettered discretion to prohibit prayer in lawfully constructed dwellings or other buildings. *Cf. Niemotko v. State of Maryland,* 340 U.S. 268, 272, 71 S.Ct. 325, 327–328, 95 L.Ed. 267 (1951) (law granting official unfettered discretion to disallow religious speech contravenes First Amendment); *Central Avenue Enterprises, Inc. v. City of Las Cruces,* 845 F.Supp. 1499, 1503 (D.N.M.1994) (terms of ordinance so ambiguous that it grants unfettered discretion to decision maker in granting special use permit violates the First Amendment).

Without a linkage to some legitimate secular interest, there is no justification for the state's prohibition of the use of the Cams' barn for church services. The barn has already been built, and the Hearings Officer has found that its use as a house of worship will not further impact farming practices. It would be different if the state had determined that the use of the barn as a regular gathering place had an effect on farming or public safety, but the state has not so deter-

mined.[10] The state asserts a right to outlaw prayer in farm buildings without having to show anything further. In this case, the state's application of the regulation to the Cams' barn is not rationally related to the legitimate interests for which the regulation is intended to promote—i.e., the preservation of farm land. Thus, even under the lower level of scrutiny, defendants' application of the regulations cannot pass constitutional muster.

The interest of the state in this case is to preserve high-value farmland. Prohibiting use of an approved farm building for prayer services does not, in and of itself, further the preservation of land for farm use. The regulation is not at all tailored to further the legitimate secular interests of the state. The state could easily advance its legitimate interests, for example, by a regulatory scheme which would operate to deny the Cams a permit for any additional barns, based upon the size of their farming operation, or by a regulatory scheme which focused upon the impact on farming practices of the public use of the building.

But where the state grants permission to construct a farm building or dwelling, it may not thereafter prohibit the act of praying in such buildings without, at a minimum, showing that such use impacts a legitimate governmental interest. *See, e.g., Islamic Center of Mississippi v. City Starkville,* 840 F.2d 293, 302 (5th Cir.1988) (zoning ordinances that serves legitimate purpose by excluding churches do not violate First Amendment where such ordinances place only incidental burdens on religious freedom and provide alternative opportunities for religious conduct). Group prayer by itself does no harm to agricultural resource land, and a prohibition against prayer meetings on farms by itself does nothing to preserve agricultural

---

9. At the hearing, the state maintained that even sharing the barn between church services and farm equipment storage would run afoul of the zoning regulations. According to the state, the barn must be exclusively used for purposes of farming. A partial use for prayer liturgies is prohibited. Trans. (# 51) at pp. 19–20. The regulations give no guidance in this area.

10. Although ordinances prohibiting churches in residential and other areas have been upheld, the cases upholding such zoning regulations generally involved legitimate state concerns with issues such as noise, traffic, public safety, etc. *See, e.g., Grosz v. City of Miami Beach, Fla.,* 721 F.2d 729 (11th Cir.1983). The instant case is thus unusual in that the Hearings Officer has found that the use of the Cams' building as a church will have no significant impact on such matters.

resource land, especially where the state permits similar meetings of a secular nature. The asserted justification by the state for the application of the regulation in this case is not only less than compelling, it does not exist. *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).

The facts of this case distinguish it from *Christian Gospel Church v. City and County of San Francisco,* 896 F.2d 1221 (9th Cir. 1990). There, legitimate state concerns regarding traffic and noise problems in an otherwise quiet residential neighborhood justified the city's interest in a zoning scheme precluding churches from the neighborhood. Here, as noted, the hearings officer found there would be no significant impact on farm use by the worship services in the Cams' building.

The facts herein are really much more analogous to those in *Islamic Center of Mississippi v. City Starkville,* 840 F.2d 293 (5th Cir.1988). There the court stated:

> The record compels the conclusion that [the city] denied an exception to the Islamic Center for reasons other than considerations of traffic control and public safety and that it applied different standards to approving a Muslim Mosque than it had adopted for worship facilities of other faiths. Moreover, the city has failed to show the importance of its purpose or that it could not have been accomplished by means less burdensome to the Muslim faithful.

*Id.* at 302–03.

No traffic control problems, farming practice impacts, or public safety reasons have been cited by the state to justify the denial of a permit to the Cams. Further, different standards have been applied to deny approval of the Uspenian Church where there is a strong likelihood that approval would have been granted to the "lawfully established" pre-existing Pokrov Church to conduct worship services in the barn.

## CONCLUSION

For the reasons stated, defendants' motions (# s 22 and 23) for summary judgment are denied and plaintiffs' motion (# 27) for summary judgment is granted. Defendants are enjoined from prohibiting plaintiffs' use of a previously approved farm building as a place of worship solely on the basis that such use constitutes the establishment of a new church. Defendants may only consider plaintiffs' conditional use application insofar as the proposed use impacts on public safety issues, farming practices, or other legitimate secular concerns identified by the Hearings Officer.