Pastor Rick BARR and Philemon
Homes, Inc., Petitioners,

v.

CITY OF SINTON, Respondent.

No. 06–0074.

Supreme Court of Texas.

Argued March 22, 2007.

Decided June 19, 2009.

pus Christi, TX, Michael Casey Matox, The Rutherford Institute, Charlottesville, VA, for Petitioners.

Carlos Villarreal (argued), James F. McKibben, Jr., Brian Charles Miller, Hermansen, McKibben, Woolsey & Villarreal, Corpus Christi, TX, for Respondent.

Allyson Newton Ho, Morgan, Lewis & Bockius LLP, Houston, TX, Jay Alan Sekulow, Erik M. Zimmerman, American Center for Law & Justice, Virginia Beach, VA, Loren Jacobson, Waters & Kraus, LLP, Dallas, TX, Douglas Laycock, University of Michigan Law School, Ann Arbor, MI, for Amicus Curiae.

Justice HECHT delivered the opinion of the Court.

The Texas Religious Freedom Restoration Act (TRFRA) provides that "a government agency may not substantially burden a person's free exercise of religion [unless it] demonstrates that the application of the burden to the person ... is in furtherance of a compelling governmental interest [and] is the least restrictive means of furthering that interest."[1] TRFRA does not immunize religious conduct from government regulation; it requires the government to tread carefully and lightly when its actions substantially burden religious exercise.

In this case, a city resident, as part of a religious ministry, offered men recently released from prison free housing and religious instruction in two homes he owned. In response, the city passed a zoning ordinance that not only precluded the use of the homes for that purpose but effectively banned the ministry from the city. The trial court found that the city had not violated TRFRA, and the court of appeals

James C. Ho (argued), Mark Whitburn, Scott H. Mellon, Michael Sean Royall, Gibson Dunn & Crutcher LLP, Dallas, TX, Kelly J. Shackelford, Hiram S. Sasser III, Jonathan M. Saenz, Liberty Legal Institute, Plano, TX, Bradford M. Condit, Cor-

1. TEX. CIV. PRAC. & REM.CODE § 110.003(a)-(b).

affirmed.[2] We reverse and remand to the trial court for further proceedings.

## I

In 1998, Pastor Richard Wayne Barr began a religious halfway house ministry through Philemon Restoration Homes, Inc., a nonprofit corporation he directed. The purpose of the ministry was to offer housing, biblical instruction, and counseling to low-level offenders released from prison on probation or parole in transition back into the community. For the most part, men accepted by the ministry had been convicted of drug-related crimes; the ministry would not accept men convicted of violent crimes or sex offenses. In application forms for would-be residents, Philemon described its function as "[c]reating bridges to enable the Christian inmate to go from prison to the local church through Biblical discipleship". Applicants were asked to respond in writing to several pages of questions inquiring about such

things as family background, drug usage, mental health, and religious faith. Applicants were also required to sign a "statement of faith" in basic Christian beliefs[3] and to agree to a long list of behavioral rules characterized as "biblical guidelines for Christian living".[4] The guidelines emphasized to prospective residents that Philemon was "a biblical ministry, NOT a social service agency". Each morning began with group prayer and Bible study.

Barr lived and operated his ministry in the City of Sinton, a town 2.2 square miles in size with a population of 5,676 (2000 census), the county seat of San Patricio County, not far from Corpus Christi. Barr owned two homes besides his residence, both of them within a block of the church he attended, Grace Christian Fellowship, which appears to have been supportive of Barr's ministry. Barr housed and taught Philemon residents in those homes, which together could hold up to

---

**2.** 295 S.W.3d 334 (Tex.App.-Corpus Christi–Edinburg 2005).

**3.** The "statement of faith" provided: "We believe the Bible to be the inspired, infallible, and authoritative Word of God. We believe that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit. We believe in the Deity of our Lord Jesus Christ, in His virgin birth, His sinless life, His atoning death on the cross, and His bodily resurrection from the grave. We believe that Jesus Christ ascended to the right hand of the Father, now rules as Head of His Body, the Church, and will personally return in power and glory. We believe that man in his natural state is lost and thus alienated from God, and that salvation through personal faith in the person and work of Jesus Christ is essential. We believe in the present ministry of the Holy Spirit, by whose indwelling a Christian is made spiritually alive and enabled to live a godly life. We believe in the resurrection of both the saved and the lost, they who are saved into the resurrection of life, and they who are lost unto the resurrection of damnation. We believe in the spiritual unity of

believers in Christ. I understand that my signature indicates my agreement with the above statement of faith."

**4.** The guidelines included: "Substance abuse of any nature is not permitted in Philemon Restoration Homes. A violation in or outside of the home is cause for termination of your residency.... Smoking anywhere is not allowed.... Possession of weapons of any nature will terminate your residency.... Be respectful of the property of other residents.... Attend and be on time for all family and biblical discipleship meetings.... Gambling or playing the lottery is not allowed.... Fights, threats, or aggressive behavior is not allowed.... Do not engage in illicit sexual activity anywhere nor in sexual activity within the house.... Borrowing or lending money is not allowed between residents or between residents and staff.... Being truthful about everything during your stay at Philemon Restoration Homes is expected.... In consideration of others, keep noise levels down and activities to a minimum after 11:00 p.m.... You are here because the Lord placed you here...."

sixteen men at one time. Though the men were unsupervised, neither Barr nor the city manager was aware of any complaint of disturbance. Barr's commitment to the ministry was personal; he himself is an ex-con.

When Barr began his ministry, the City imposed no zoning or other restrictions on his use of the homes. In January 1999, Barr discussed his ministry with Sinton's mayor, city manager, and police chief, and a few weeks later he presented his ministry before the city council. In response to questions whether Philemon was in compliance with state law, Barr researched the matter and concluded that it was.[5] In April, the city council held a public hearing at which a large number of people expressed both opposition to as well as support of Barr's ministry. A few days later, the city council passed Ordinance 1999–02, which added to the City Code a section that provided as follows:

A correctional or rehabilitation facility may not be located in the City of Sinton within 1000 feet of a residential area, a primary or secondary school, property designated as a public park or public recreation area by any governmental authority, or a church, synagogue, or other place of worship.

For the purposes of this section distance is measured along the shortest straight line between the nearest property line of the correctional or rehabilitation facility and the nearest property line of the residential area, school, park, recreation area, or place of worship, as appropriate.

For the purposes of this section "Correctional or rehabilitation facility" means a residential facility that is not operated by the federal government, the state of Texas, nor San Patricio County, and that is operated for the purpose of housing persons who have been convicted of misdemeanors or felonies or children found to have engaged in delinquent conduct, regardless of whether the persons are housed

(i) while serving a sentence of confinement following conviction of an offense;

(ii) as a condition of probation, parole, or mandatory supervision; or

(iii) within one (1) year after having been released from confinement in any penal institution.

For the purposes of this section "residential area" means

(i) any area designated as a residential zoning district by this ordinance, and

(ii) any area in which the principal permitted land use by this ordinance is for private residences.

The City Council finds the requirements of this section are reasonably necessary to preserve the public safety, morals, and general welfare.

As the city manager later confirmed, Ordinance 1999–02 targeted Barr and Philemon.[6] The halfway houses they operat-

---

5. Specifically, the questions concerned chapter 244 of the Local Government Code, relating to the location of correctional or rehabilitation facilities, and chapter 509 of the Texas Government Code, relating to the operation of community corrections facilities. Both chapters apply to facilities operated by the government or under government contract. Tex. Loc. Gov't Code § 244.001(1)(A); Tex. Gov't

Code § 509.001(1). Barr and Philemon have never operated under government contract.

6. At trial, Jackie Knox, the city manager at the time Ordinance 1999–02 was passed, testified as follows:

"Q. Was this ordinance written in response to activities of the home that Mr. Barr and Philemon operates?

ed were unquestionably within 1,000 feet of a church; indeed, they were across the street from the Grace Fellowship Church, which was helping to support the ministry. But the ordinance was broader, and was intended to be. Because Sinton is small, it would be difficult for a halfway house to be located anywhere within the city limits. The city manager later testified:

> Q. Is there any property within the city limits of Sinton that you are aware of that would qualify not being 1000 feet from any church, school, park—right—or residential area?
>
> A. I have not checked it out, but it would probably be minimal locations.
>
> Q. In other words, probably pretty close to nonexistent?
>
> A. Possibly.
>
> Q. Would that be a fair statement?
>
> A. A fair statement.

"A. That was probably one of the agents of doing this, yes, sir.
"Q. That was the purpose of the ordinance?
"A. Probably so.
"Q. I'm sorry?
"A. For an establishment like that, yes.
"Q. Was there any other establishment to your knowledge—
"A. No, sir.
"Q.—being targeted?
"A. No, sir.
"Q. So this one was specifically targeted?
"A. For that type of establishment, yes."

**7.** The city manager testified briefly about a facility located outside the City:
"Q. You were asked a question about the detention facilities in the city. Is there some type of facility that is very near the city limits that is used by other state agencies for—
"A. Yes, sir, the restitution center there on 77 Business.
"Q. How far is that from the city limits?
"A. It's just outside the city limits.
"Q. Did the city also have public hearings on that?

There was no evidence that any specific site within the city was available.[7]

Despite the ordinance, Barr continued to conduct his ministry as he had before. Though violations were punishable by a civil fine of $500 per day, neither Barr nor Philemon was ever cited. By the summer of 2000, Barr had taken in fifteen men altogether. Then in October 2000, the Sinton police chief complained to the Texas Board of Pardons and Paroles that Barr and Philemon were housing parolees in violation of a city ordinance, and for awhile parole officials refused to approve the arrangement. Philemon residents went to live with members of the Grace Fellowship Church.

In June 2001, Barr's attorney notified the City by letter that Barr claimed Ordinance 1999–02 violated TRFRA.[8] The City did not respond, and in August, Barr and Philemon sued the City under TRFRA, seeking injunctive relief, a declaratory judgment, monetary damages, and

"A. That I have no idea. I think that was prior to any knowledge I would have of that. That was before my time."

**8.** The attorney's letter to the City referred to the ordinance as 156.026, the number of the section that Ordinance 1999–02 added to the City Code. Although the trial court found that "[p]laintiffs failed to give notice as required by the Religious Freedom Act", the City does not argue that here. *See* Tex. Civ. Prac. & Rem.Code § 110.006(a) ("A person may not bring an action to assert a claim under this chapter unless, 60 days before bringing the action, the person gives written notice to the government agency by certified mail, return receipt requested: (1) that the person's free exercise of religion is substantially burdened by an exercise of the government agency's governmental authority; (2) of the particular act or refusal to act that is burdened; and (3) of the manner in which the exercise of governmental authority burdens the act or refusal to act.").

attorney fees.[9] In October, state officials withdrew objections to Philemon's halfway house operation, and parolees were again permitted to stay in the homes. But after the trial court denied Barr and Philemon's request for a temporary injunction in January 2002,[10] the Texas Board of Pardons and Paroles for the second time stopped approving parolees to live in Barr's homes and had the residents removed. Since then, Barr and Philemon have been unable to continue their ministry.

The parties agreed to a bifurcated trial to the bench, reserving the issues of damages and attorney fees pending the court's ruling on whether Ordinance 1999–02 violated the TRFRA. In November 2003, the court rendered judgment for the City. The court found that Barr and Philemon had operated "a correctional or rehabilitation facility" in violation of Ordinance 1999–02's 1,000–foot restriction, and that the ordinance did not violate TRFRA in any respect: that is, the ordinance did not substantially burden Barr's and Philemon's free exercise of religion, it was in further-

ance of a compelling governmental interest, and it was the least restrictive means of furthering that interest.[11] Given the court's ruling, the issues of damages and attorney fees were never reached.

The court of appeals affirmed, concluding that Ordinance 1999–02 does not violate TRFRA because

> there is nothing in the ordinance that precludes [Barr] from providing his religious ministry to parolees and probationers, from providing instruction, counsel, and helpful assistance in other facilities in Sinton, or from housing these persons outside the City and providing his religious ministry to them there.

\* \* \*

Moreover, Texas courts have long applied zoning ordinances to church-operated schools and colleges, supporting the conclusion that zoning ordinances do not substantially burden such auxiliary religious operations.[12]

---

**9.** *See* Tex. Civ. Prac. & Rem.Code § 110.005(a)-(b)("(a) Any person, other than a government agency, who successfully asserts a claim or defense under this chapter is entitled to recover: (1) declaratory relief under Chapter 37; (2) injunctive relief to prevent the threatened violation or continued violation; (3) compensatory damages for pecuniary and nonpecuniary losses; and (4) reasonable attorney's fees, court costs, and other reasonable expenses incurred in bringing the action. (b) Compensatory damages awarded under Subsection (a)(3) may not exceed $10,000 for each entire, distinct controversy, without regard to the number of members or other persons within a religious group who claim injury as a result of the government agency's exercise of governmental authority. A claimant is not entitled to recover exemplary damages under this chapter.").

**10.** On interlocutory appeal, the court of appeals affirmed the trial court's order. *Barr v. City of Sinton*, No. 13–02–079–CV, 2003 Tex.

App. LEXIS 2311, 2003 WL 1340689 (Tex. App.-Corpus Christi Mar.20, 2003) (op. on reh'g). We dismissed the petition for review for want of jurisdiction. *Barr v. City of Sinton*, 46 Tex. Sup.Ct. J. 1062 (Aug. 28, 2003).

**11.** The trial court also found that Barr and Philemon's "facility" violated the 1,000–foot restriction imposed on certain correctional or rehabilitation facilities under section 244.003 of the Texas Local Government Code, and the minimum standards for certain community correction facilities under section 509.006(c) of the Texas Government Code. Both statutes apply only to facilities operated by the government or under contract with the government. Tex. Loc. Gov't Code § 244.003; Tex. Gov't Code § 509.001. Although the trial court found that Barr and Philemon operated under contract with the government, there is no evidence they did.

**12.** 295 S.W.3d 334, 344 (Tex.App.-Corpus Christi–Edinburg 2005).

We granted Barr and Philemon's petition for review.[13] Because petitioners' arguments are identical, we refer to petitioners collectively as "Barr".[14]

## II

In 1997, the United States Supreme Court in *City of Boerne v. Flores*[15] recounted its 1990 decision in *Employment Division, Department of Human Resources v. Smith*[16] and Congress's reaction to it. *Smith* had held that under the Free Exercise Clause of the First Amendment,[17] "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest."[18] Specifically, the Court held that a generally applicable Oregon statute criminalizing the use of peyote did not violate the Free Exercise rights of members of the Native American Church who ingested the drug for sacramental purposes.[19] *City of Boerne* explained that in *Smith*, the Court had "declined to apply the balancing test set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), under which we would have asked whether Oregon's prohibition substantially burdened a religious practice and, if it did, whether the burden was justified by a compelling government interest."[20] *Sherbert* had held that under the Free Exercise Clause, a member of the Seventh-day Adventist Church who refused to work on Saturday, the Sabbath Day of her faith, could not be denied unemployment benefits because she was not "available for work" as required by generally applicable state law.[21] *Smith* also distinguished another case involving a generally applicable law, *Wisconsin v. Yoder*,[22] in which the Court "invalidated Wisconsin's mandatory school-attendance law as applied to Amish parents who refused on religious grounds to send their children to school. That case implicated not only the right to free religious exercise but also the right of parents to control their children's education."[23]

Four Members of the Court in *Smith* contended that the majority's decision "dramatically departs from well-settled First Amendment jurisprudence . . . and is incompatible with our Nation's fundamental commitment to individual religious liberty."[24] They were not alone in that view. The Court in *City of Boerne* acknowledged that "[m]any criticized the Court's reasoning [in *Smith* ], and this disagreement re-

---

13. 50 Tex. Sup.Ct. J. 218 (Tex. Dec. 15, 2006).

14. We have received amicus briefs from the American Center for Law and Justice, the American Civil Liberties Union Foundation of Texas, Senator David Sibley, Representative Scott Hochberg, and Prison Fellowship, all in support of petitioners.

15. 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

16. 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

17. U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .").

18. *City of Boerne*, 521 U.S. at 514, 117 S.Ct. 2157.

19. *Id.* at 513, 117 S.Ct. 2157.

20. *Id.*

21. 374 U.S. 398, 399–402, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

22. 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

23. *City of Boerne*, 521 U.S. at 514, 117 S.Ct. 2157.

24. *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 891, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (O'Connor, J., concurring in the judgment).

sulted in the passage of RFRA"[25]—the Religious Freedom Restoration Act of 1993.[26] While Congress could not, of course, alter *Smith*'s reading of the First Amendment, it could provide more protection by statute. In enacting RFRA, Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise",[27] and that "governments should not substantially burden religious exercise without compelling justification".[28] The purpose of RFRA, Congress declared, was "to restore the compelling interest test as set forth in [*Sherbert* and *Yoder*] and to guarantee its application in all cases where free exercise of religion is substantially burdened; and ... to provide a claim or defense to persons whose religious exercise is substantially burdened by government."[29] Thus, RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability [unless it] demonstrates that application of the burden to the person ... is in furtherance of a compelling governmental interest; and ... is the least restrictive means of furthering that compelling governmental interest."[30]

As originally enacted, RFRA applied to the States as well as the federal government,[31] but *City of Boerne* held that in extending RFRA to the States, Congress exceeded its enforcement authority under Section 5 of the Fourteenth Amendment.[32] In response, Congress amended RFRA to limit its application to the governments of the United States, its territories and possessions, and the District of Columbia and Puerto Rico.[33] But at the same time, Congress enacted the Religious Exercise in Land Use and by Institutionalized Persons Act of 2000 (RLUIPA),[34] which applied the RFRA standard to land use regulation.[35] RLUIPA applies not only to the federal government but to state and local govern-

25. *City of Boerne*, 521 U.S. at 515, 117 S.Ct. 2157.

26. Religious Freedom Restoration Act of 1993, Pub.L. No. 103–141, 107 Stat. 1488 (1993) (codified at 42 U.S.C. §§ 2000bb to 2000bb–4 (2006)).

27. *Id.* § 2000bb(a)(2).

28. *Id.* § 2000bb(a)(3).

29. *Id.* § 2000bb(b).

30. *Id.* § 2000bb–1(a) to (b).

31. §§ 5(1), 6(a), 107 Stat. at 1489.

32. 521 U.S. 507, 532–534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *see Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 424 n. 1, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) ("As originally enacted, RFRA applied to States as well as the Federal Government. In [*City of Boerne*], we held the application to States to be beyond Congress' legislative authority under § 5 of the 14th Amendment.").

33. Religious Land Use and Institutionalized Person Act of 2000, Pub.L. No. 106–274, § 7, 114 Stat. 803, 806 (2000) (codified at 42 U.S.C. § 2000bb–2(1) to (2) (2006)); *see also Cutter v. Wilkinson*, 544 U.S. 709, 715 n. 2, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) ("RFRA, Courts of Appeals have held, remains operative as to the Federal Government and federal territories and possessions. This Court, however, has not had occasion to rule on the matter." (citations omitted)).

34. §§ 2–6, 8, 114 Stat. at 803–807 (codified at 42 U.S.C. §§ 2000cc to 2000cc–5).

35. 42 U.S.C. § 2000cc(a)(1) ("No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.").

ments when the activity is federally funded or affects interstate commerce.[36]

States also reacted to *Smith*. *Smith*'s construction of the Free Exercise Clause does not preclude a state from requiring strict scrutiny of infringements on religious freedom, either by statute or under the state constitution,[37] and many states have done just that, Texas among them.[38] The Texas Legislature enacted TRFRA in 1999,[39] which like RFRA provides in part, that government "may not substantially burden a person's free exercise of religion [unless it] demonstrates that the application of the burden to the person … is in furtherance of a compelling governmental interest; and … is the least restrictive means of furthering that interest."[40] The Act states that "[t]he protection of religious freedom afforded by this chapter is in addition to the protections provided under federal law and the constitutions of this state and the United States."[41]

Because TRFRA, RFRA, and RLUIPA were all enacted in response to *Smith* and were animated in their common history, language, and purpose by the same spirit of protection of religious freedom, we will consider decisions applying the federal statutes germane in applying the Texas statute.[42]

### III

■ At the outset, the City argues, and the court of appeals concluded, that TRFRA's strict scrutiny does not apply to zoning ordinances. The court of appeals reasoned simply that nothing prevented Barr from relocating elsewhere in the City or moving outside.[43] But ease of reloca-

---

36. *Id.* §§ 2000cc(b), –2(g), –5(4).

37. Although this Court applied *Smith* in *HEB Ministries, Inc. v. Texas Higher Education Coordinating Board*, 235 S.W.3d 627 (Tex. 2007), we found it unnecessary to decide in that case whether to construe article I, section 6 of the Texas Constitution as *Smith* construed the federal Free Exercise Clause. We have not addressed that issue and do not do so here.

38. *See* William W. Bassett, Religious Organizations and the Law § 2:54 (2008) (listing 13 states that have adopted statutes and 17 in which courts have adopted a stricter standard than *Smith* ).

39. Act of May 30, 1999, 76th Leg., R.S., ch. 399, 1999 Tex. Gen. Laws 2511.

40. Tex. Civ. Prac. & Rem.Code § 110.003(a)-(b).

41. *Id.* § 110.009(b).

42. *See, e.g., R.R. Street & Co. Inc. v. Pilgrim Enters., Inc.*, 166 S.W.3d 232, 241 (Tex.2005) (stating that construction of the Texas Solid Waste Disposal Act would be guided by federal cases construing its federal counterpart, the Comprehensive Environmental Response, Compensation, and Liability Act); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex.2001) (stating that because the purposes of the Texas Commission on Human Rights Act and Title VII of the federal Civil Rights Act of 1964 are similar, federal case law is instructive in applying the state statute); *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 360–361 (Tex.2000) (plurality opinion) (stating that the federal Freedom of Information Act is instructive in construing the Texas Public Information Act); *National Tank Co. v. Brotherton*, 851 S.W.2d 193, 202 (Tex.1993) (stating that because the work product doctrine is similar in Texas and federal courts, federal case law is instructive).

43. 295 S.W.3d at 343–44 ("Assuming without determining that Pastor Barr's ministry is substantially motivated by sincere religious belief, we nonetheless conclude that while the ordinance precludes Pastor Barr from operating a correctional or rehabilitation facility within 1000 feet of residential areas, schools, parks, recreation areas, and places of worship, which may include most of the City, there is nothing in the ordinance that precludes him from providing his religious ministry to parolees and probationers, from providing instruction, counsel, and helpful assistance in other facilities in Sinton, or from housing these persons outside the City and providing his religious ministry to them there." (footnote omitted)).

tion goes to whether the burden of a zoning ordinance on a person's free exercise of religion is substantial, not to whether zoning ordinances are categorically exempt from TRFRA. The court of appeals added that zoning laws have long been applied to religious education facilities.[44] But that generalization shows only that it is possible for zoning laws not to substantially burden free religious exercise. The opposite is also possible. This Court, for example, has held that zoning laws cannot be used to exclude churches from all residential districts in some circumstances.[45] In any event, not only is the court of appeals' analysis flawed, it is contradicted by TRFRA's express terms, which require strict scrutiny of "*any* ordinance, rule, order, decision, practice, or other exercise of governmental authority."[46] Zoning ordinances easily fall into this group.

Unlike the court of appeals, the City relies on TRFRA's text, specifically, the first sentence of section 110.010, which states: "Notwithstanding any other provision of this chapter, a municipality has no less authority to adopt or apply laws and regulations concerning zoning, land use planning, traffic management, urban nuisance, or historic preservation than the authority of the municipality that existed under the law as interpreted by the federal courts before April 17, 1990"—the date the Supreme Court issued its decision in *Smith.* The statute thus preserves the authority municipalities had under "the law" interpreted by the federal courts pre-*Smith.* The only restriction on the governing law is that it come from pre-*Smith* federal case law. Guidance may be drawn from cases involving constitutional limits on zoning and land-use ordinances as well as from cases applying the Free Exercise Clause, or even the First Amendment generally, in other contexts. For example, *Sherbert* involved unemployment laws, and *Yoder* involved compulsory school attendance laws; both involved the Free Exercise Clause, while *Yoder* also involved parental rights; but each demonstrates the balancing of interests that *Smith* eschewed and that the statutes enacted in response—RFRA, TRFRA, and RLUIPA—all require.

The City argues first that the impact of zoning on the free exercise of religion is never subject to strict scrutiny. The Supreme Court has clearly refuted this argument. In *Schad v. Borough of Mount Ephraim,* the Supreme Court wrote:

> The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it must

---

44. *Id.* at 344 ("Moreover, Texas courts have long applied zoning ordinances to church-operated schools and colleges, supporting the conclusion that zoning ordinances do not substantially burden such auxiliary religious operations." (citing *Fountain Gate Ministries, Inc. v. City of Plano,* 654 S.W.2d 841, 844 (Tex.App.-Dallas 1983, writ ref'd n.r.e.), and *Heard v. City of Dallas,* 456 S.W.2d 440, 444 (Tex.App.-Dallas 1970, writ ref'd n.r.e.))).

45. *See City of Sherman v. Simms,* 143 Tex. 115, 183 S.W.2d 415, 416–417 (1944) ("[T]he power to establish zones is a police power and its exercise cannot be extended beyond the accomplishment of purposes rightly within the scope of that power. To exclude churches from residential districts does not promote the health, the safety, the morals or the general welfare of the community, and to relegate them to business and manufacturing districts could conceivably result in imposing a burden upon the free right to worship and, in some instances, in prohibiting altogether the exercise of that right. An ordinance fraught with that danger will not be enforced.").

46. TEX. CIV. PRAC. & REM.CODE § 110.002(a) (emphasis added).

be exercised within constitutional limits....

\* \* \*

[A]s is true of other ordinances, when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest.... Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of First Amendment rights.... [T]he Court must not only assess the substantiality of the governmental interests asserted but also determine whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment: [a municipality] may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms.... Precision of regulation must be the touchstone.[47]

*Schad* held that a borough could not use zoning laws to prohibit all live entertainment, including live adult entertainment,

within its borders.[48] Surely the free exercise of religion is entitled to no less protection than adult entertainment.

In *Sherbert*, the Supreme Court held that denying unemployment benefits to someone because she would not work on Saturday, a religious day for her, was a "substantial infringement" of her rights that could be justified only by "some compelling state interest".[49] "It is basic", the Court wrote, "that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '(o)nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation'".[50] There is no reason to require strict scrutiny of unemployment compensation laws but not zoning laws.

The City argues more narrowly that pre-*Smith* federal cases specifically involving conflicts between zoning ordinances and the Free Exercise Clause do not require strict scrutiny when a zoning ordinance is facially neutral with respect to religion and impacts free exercise only in its across-the-board application, even if the impact is substantial. The City cites five cases, each of which involved the application of zoning laws to places of worship: *Christian Gospel Church, Inc. v. City and County of San Francisco;*[51] *Messiah Baptist Church v. County of Jefferson;*[52] *Islamic Center of Mississippi, Inc. v. City of Starkville;*[53] *Grosz v. City of Miami Beach;*[54] and *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of*

---

**47.** 452 U.S. 61, 68–70, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (citations, footnotes, and internal quotation marks and brackets omitted).

**48.** *Id.* at 65, 101 S.Ct. 2176.

**49.** 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

**50.** *Id.* (quoting *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)).

**51.** 896 F.2d 1221 (9th Cir.1990).

**52.** 859 F.2d 820 (10th Cir.1988).

**53.** 840 F.2d 293 (5th Cir.1988).

**54.** 721 F.2d 729 (11th Cir.1983).

*Lakewood.*[55] *Islamic Center* appears to have applied a standard similar to that required by TRFRA, stating that zoning laws that infringe upon First Amendment rights "must be narrowly drawn in furtherance of a substantial government interest"[56] that could not be served "by a means less burdensome to the exercise of religion."[57] Although far less clear, *Grosz* referred to a "principle that has emerged in free exercise doctrine, the 'least restrictive means test,'"[58] and "[a]nother principle" that "a showing of 'compelling state interest' on the government side will justify inroads on religious liberty."[59] Two other cases, *Christian Gospel Church*[60] and *Lakewood Jehovah's Witnesses,*[61] required that the government have a "compelling interest" in zoning restrictions that impact free religious exercise. In *Messiah Baptist Church,* the court found that zoning regulations had no significant impact on the free exercise of religion and therefore did not state a standard.[62] In sum, four of the five cases the City cites contradict its contention that pre-*Smith* federal cases did not strictly scrutinize zoning or-

dinances that impact free religious exercise.

None of the arguments made by the City or the court of appeals supports the assertion that zoning ordinances are exempt from TRFRA. Accordingly, we turn to the Act's application in this case.

## IV

Applying TRFRA to this case raises four questions, each succeeding question contingent on an affirmative answer to the one preceding:

- Does the City's Ordinance 1999–02 burden Barr's "free exercise of religion" as defined by TRFRA?
- Is the burden substantial?
- Does the ordinance further a compelling governmental interest?
- Is the ordinance the least restrictive means of furthering that interest?

We consider these questions in the order presented. While we must accept the trial court's fact findings supported by the evidence, the ultimate answers determine the legal rights protected by the Act and are thus matters of law.[63]

---

**55.** 699 F.2d 303 (6th Cir.1983).

**56.** *Islamic Ctr.,* 840 F.2d at 299.

**57.** *Id.* at 300.

**58.** *Grosz,* 721 F.2d at 734.

**59.** *Id.* at 737 (citing *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).

**60.** *Christian Gospel Church, Inc., v. City & County of San Francisco,* 896 F.2d 1221, 1223–1224 (9th Cir.1990) ("We have articulated a general standard for evaluating the impact of a government provision on the exercise of religion and we find that this test is appropriate for analyzing a challenge to zoning laws. This test involves examining the

following three factors: (1) the magnitude of the statute's impact upon the exercise of the religious belief; (2) the existence of a compelling state interest justifying the imposed burden upon the exercise of the religious belief; and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.").

**61.** *Lakewood, Ohio Congregation of Jehovah's Witnesses v. City of Lakewood,* 699 F.2d 303, 305 (6th Cir.1983) ("If the ordinance does infringe the Congregation's first amendment right, the City must justify the ordinance by a compelling governmental interest.").

**62.** 859 F.2d 820, 824–825 (10th Cir.1988).

**63.** *See, e.g., Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 932–933 (Tex.1998) ("Although determining whether a property regu-

## A

■ The City argues that Barr's free exercise of religion is not involved because a halfway house need not be a religious operation. But the fact that a halfway house *can be* secular does not mean that it *cannot be* religious. TRFRA defines "free exercise of religion" as "an act or refusal to act that is substantially motivated by sincere religious belief", adding that "[i]n determining whether an act or refusal to act is substantially motivated by sincere religious belief under this chapter, it is not necessary to determine that the act or refusal to act is motivated by a central part or central requirement of the person's sincere religious belief."[64] Not only is such a determination unnecessary, it is impossible for the judiciary. As the Supreme Court stated in a part of *Smith* unaffected by RFRA:

> It is no more appropriate for judges to determine the "centrality" of religious beliefs before applying a "compelling interest" test in the free exercise field, than it would be for them to determine the "importance" of ideas before applying the "compelling interest" test in the free speech field. What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is "central" to his personal faith? Judging the centrality of differ-

ent religious practices is akin to the unacceptable "business of evaluating the relative merits of differing religious claims." As we reaffirmed only last Term, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. [680,] 699 [109 S.Ct. 2136, 104 L.Ed.2d 766] [1989]. Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.[65]

We agree.

The trial court appears to have been troubled that an operation which can be and often is conducted for purely secular purposes could be entitled to increased protection from government regulation if conducted for religious reasons. But TRFRA guarantees such protection. Just as a Bible study group and a book club are not treated the same, neither are a halfway house operated for religious purposes and one that is not. Under *Smith*, the Free Exercise Clause does not require strict scrutiny for religious activity affected by neutral laws of general application,[66] but TRFRA imposes the requirement by statute.

---

lation is unconstitutional requires the consideration of a number of factual issues, the ultimate question of whether a zoning ordinance constitutes a compensable taking or violates due process or equal protection is a question of law, not a question of fact.... While we depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." (citations omitted)).

**64.** Tex. Civ. Prac. & Rem.Code § 110.001(a)(1).

**65.** *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 886–887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (citation omitted).

**66.** *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 424, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) ("In *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), this Court held that the Free Exercise Clause of the First Amendment does not prohibit governments from burdening religious practices through generally applicable laws.").

The City does not dispute that the purpose of Barr's ministry was to provide convicts a biblically supported transition to civic life. Applicants were required to sign a statement of faith, agree to abide by stated biblical principles, and commit as a group to daily prayer and Bible study. They were specifically told that the Barr's halfway house was "a biblical ministry, NOT a social service agency". Barr considered the halfway house a religious ministry, and it appears to have been supported by his church. The record easily establishes that Barr's ministry was "substantially motivated by sincere religious belief" for purposes of the TRFRA.

### B

■■■ TRFRA does not elaborate on what it means to "substantially burden" the right to free religious exercise, and that particular phrase is not used elsewhere in Texas statutes, unlike the words "substantial" and "substantially", which are used thousands of times. So far as we have been able to find, however, they are never defined. The same phrase is used in RFRA and RLUIPA, but it is not defined in those statutes, either. Absent any special meaning, we use ordinary meanings in common parlance.[67] *Webster's Third New International Dictionary* defines "substantial" in part as "material", "not seeming or imaginary", "real", "true", "being of moment", "important".[68] Thus defined, "substantial" has two basic components: real vs. merely perceived, and significant vs. trivial. These limitations leave a broad range of things covered.

■■■ To determine whether a person's free exercise of religion has been substantially burdened, some courts have focused on the burden on the person's religious beliefs rather than the burden on his conduct. Under what have been referred to as the compulsion and centrality tests, the issue is whether the person's conduct that is being burdened is compelled by or central to his religion.[69] The problems with these approaches are the same as those in determining whether conduct is religious. It may require a court to do what it cannot do: assess the demands of religion on its adherents and the importance of particular conduct to the religion. And it is inconsistent with the statutory directive that religious conduct be determined without regard for whether the actor's motivation is "a central part or central requirement of the person's sincere religious belief."[70] These problems are avoided if the focus is on the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression. The burden must be measured, of course, from the person's perspective, not from the government's. Thus, the United States Court of Appeals for the Fifth Circuit, after surveying decisions by other courts, recently held that under RLUIPA, "a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."[71] Amici curiae sug-

---

67. Tex. Gov't Code § 312.002 (stating that "words shall be given their ordinary meaning" except when "a word is connected with and used with reference to a particular trade or subject matter or is used as a word of art").

68. Webster's Third New Int'l Dictionary 2280 (1961).

69. *See Coronel v. Paul,* 316 F.Supp.2d 868, 876–880 (D.Ariz.2004) (discussing cases and commentaries).

70. Tex. Civ. Prac. & Rem.Code § 110.001(a)(1).

71. *Adkins v. Kaspar,* 393 F.3d 559, 570 (5th Cir.2004).

gest the following: "A person's religious exercise has been substantially burdened under the Texas RFRA when his ability to express adherence to his faith through a particular religiously-motivated act has been meaningfully curtailed or he has otherwise been truly pressured significantly to modify his conduct." [72] Like the Fifth Circuit, however, "we make no effort to craft a bright-line rule" or one that will apply in every context.[73] TRFRA, like its federal cousins, "requires a case-by-case, fact-specific inquiry".[74]

■ Ordinance 1999–02 prohibited Barr from operating his halfway house ministry in the two homes he owned adjacent his supporting church, and the city manager testified that it was "a fair statement" that alternate locations were "probably ... minimal" and "possibly" "pretty close to nonexistent". The court of appeals stated that "there is nothing in the ordinance that precludes Barr from providing his religious ministry to parolees and probationers, from providing instruction, counsel, and helpful assistance in other facilities in Sinton, or from housing these persons outside the City and providing his religious ministry to them there." [75] But there is no evidence of any alternate location in the City of Sinton where the ordinance would have allowed Barr's ministry to operate, or of possible locations outside the city.

Moreover, while evidence of alternatives is certainly relevant to the issue whether zoning restrictions substantially burden free religious exercise, evidence of *some* possible alternative, irrespective of the difficulties presented, does not, standing alone, disprove substantial burden.[76] In a related context, the Supreme Court has observed that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." [77] As a practical matter, the ordinance ended Barr's ministry, as the City Council surely knew it would.[78] We therefore have no hesitation in concluding that Ordinance 1999–02 substantially burdened Barr's ministry. The trial court's unexplained finding to the contrary has no support in the evidence.

The City argues that its zoning restrictions on locating Barr's ministry inside city limits could not have been a substantial burden because the City is so small that excluding the ministry from inside the city limits was inconsequential. But size alone is not determinative. The *Schad* case involved the Borough of Mount Ephraim,[79] a municipality about half the size of Sinton in area, with roughly the same population at the times relevant to that case and this one.[80] The Supreme Court did not consider the small size of the municipality to be

---

**72.** Brief of the American Center for Law and Justice, the American Civil Liberties Union Foundation of Texas, Senator David Sibley, and Representative Scott Hochberg as Amici Curiae Supporting Petitioners at 3.

**73.** *Adkins*, 393 F.3d at 571.

**74.** *Id.*

**75.** 295 S.W.3d at 343–44.

**76.** *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir.2005) (holding that requir-

ing church to relocate, while not an insuperable burden, was substantial).

**77.** *Schneider v. New Jersey*, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

**78.** *See supra* note 6.

**79.** *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).

**80.** *See* Borough of Mount Ephraim, New Jersey, http://www.mountephraim-nj/statistics. html (last visited June 12, 2009).

important and specifically rejected the argument that the adult entertainment business at issue could simply move elsewhere.[81] Moreover, as we have noted, there is no evidence regarding alternative locations for Barr's ministry.

The City also argues that Barr could have continued his ministry as long as each person he desired to help either owned his own home or was a guest in another's home. The City points out that the residents in Barr's homes eventually moved in with members of Barr's church. But of course, that occurred as the ministry came to an end. There is no evidence that Barr could have continued his ministry one-on-one to probationers and parolees scattered out in different homes. In any event, a burden on a person's religious exercise is not insubstantial simply because he could always choose to do something else.

The City argues that Barr's ministry was not substantially burdened because he was never cited or charged with a crime, but nothing in TRFRA suggests that either is necessary for a burden to be substantial. The City contends that no requirement imposed on the operation of a correctional institution can substantially burden religious exercise, pointing to statutes passed with TRFRA that create a rebuttable presumption that such requirements meet strict scrutiny.[82] But the presumption those statutes create is rebuttable, and in any event, they do not apply to Barr's halfway houses because Barr did not operate under contract with the government.

The City argues that its position finds support in the five pre-*Smith* federal cases it cites regarding the impact of zoning laws on the location of worship facilities. While four of the cases found no substantial burden on religious practice, they are readily distinguished. In two of the cases, relatively small groups in large cities—in *Grosz*, an orthodox Jewish group of usually ten to twenty people in Miami Beach,[83] and in *Christian Gospel Church* a group of

---

81. *Schad*, 452 U.S. at 76–77, 101 S.Ct. 2176.

82. Tex. Gov't Code § 76.018 ("For purposes of Chapter 110, Civil Practice and Remedies Code, an ordinance, rule, order, decision, or practice that applies to a person in the custody of a correctional facility operated by or under a contract with a community supervision and corrections department is presumed to be in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest. The presumption may be rebutted."); *id.* § 493.024 ("For purposes of Chapter 110, Civil Practice and Remedies Code, an ordinance, rule, order, decision, or practice that applies to a person in the custody of a jail or other correctional facility operated by or under a contract with the department is presumed to be in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest. The presumption may be rebutted."); Tex. Hum. Res.Code § 61.097 ("For purposes of Chapter 110, Civil Practice and Remedies Code, an ordinance, rule, order, decision, or practice that applies to a person in the custody of a juvenile detention facility or other correctional facility operated by or under a contract with the commission, a county, or a juvenile probation department is presumed to be in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest. The presumption may be rebutted."); Tex. Loc. Gov't Code § 361.101 ("For purposes of Chapter 110, Civil Practice and Remedies Code, an ordinance, rule, order, decision, or practice that applies to a person in the custody of a municipal or county jail or other correctional facility operated by or under a contract with a county or municipality is presumed to be in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest. The presumption may be rebutted.")

83. *Grosz v. City of Miami Beach*, 721 F.2d 729, 731 (11th Cir.1983).

about fifty people in San Francisco [84]— sought to meet in homes in areas zoned residential, asserting that home-worship was important to their religious beliefs. In *Grosz,* churches were permitted by zoning in half the city, including an area just four blocks from the home sought to be used.[85] In *Christian Gospel Church,* the group had been meeting in a hotel banquet room, and there were areas throughout the city, including residential areas, where churches might meet.[86] Two other cases involved larger groups who sought to build facilities. In *Lakewood,* a Jehovah's Witness congregation that had been meeting in a commercial area wanted to relocate to a residential area.[87] Although zoning in only about ten percent of the city permitted churches, the court concluded that the congregation could easily find a location in those areas or purchase a church building in a residential area.[88] In *Messiah Baptist Church,* a church bought 80 acres in an area zoned for agricultural use, intending to construct a 12,000–square–foot facility, including a worship area, administrative office, and a gymnasium, along with a 151–car parking lot and an amphitheater for drive-in worshipers.[89] The court concluded that the church's religious practice was not unduly burdened merely because it was denied such use of land that was inexpensive and attractive.[90]

The fifth case, *Islamic Center,* held that the use of zoning restrictions to exclude Muslims at Mississippi State University from worshiping in a home in a residential area in Starkville, Mississippi, violated the Free Exercise Clause.[91] The court concluded that the zoning restrictions were impermissibly burdensome because they "force[d] Muslims to worship in the least acceptable parts of the City or in the county outside the City's boundaries".[92] The court rejected the city's argument that the Muslims could simply go elsewhere:

> And a city may not escape the constitutional protection afforded against its actions by protesting that those who seek an activity it forbids may find it elsewhere. By making a mosque relatively inaccessible within the city limits to Muslims who lack automobile transportation, the City burdens their exercise of their religion.

> \* \* \*

> As the Supreme Court observed in *Schad,* the availability of other sites outside city limits does not permit a city to forbid the exercise of a constitutionally protected right within its limits. "[One] is not to have the exercise of his liberty of expression [and, we add, his freedom of religion] in appropriate places abridged on the plea that it may be exercised in some other place." [93]

**84.** *Christian Gospel Church, Inc. v. City & County of San Francisco,* 896 F.2d 1221, 1222–1223 (9th Cir.1990).

**85.** *Grosz,* 721 F.2d at 739.

**86.** *Christian Gospel Church,* 896 F.2d at 1224.

**87.** *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303, 304–305 (6th Cir.1983).

**88.** *Id.* at 307.

**89.** *Messiah Baptist Church v. County of Jefferson,* 859 F.2d 820, 821 (10th Cir.1988).

**90.** *Id.* at 824–825.

**91.** *Islamic Ctr. of Miss., Inc. v. City of Starkville,* 840 F.2d 293, 294 (5th Cir.1988).

**92.** *Id.* at 298.

**93.** *Id.* at 299, 300 (brackets in original, footnotes omitted, quoting *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 76–77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (quoting *Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939))).

Although the zoning ordinance did not foreclose all locations, the court determined "relatively impecunious Muslim students" were left with "no practical alternatives for establishing a mosque in the city limits." [94]

The City argues that the decision in *Islamic Center* was based on the use of zoning to discriminate against a particular religion, something that it did not do in the present case. The City of Starkville had permitted a large number of Christian churches in the same area from which the Muslim mosque was prohibited; [95] indeed, a Pentecostal church met right next door to the Muslims' property.[96] But these facts were pertinent to the city's justification of the zoning ordinance, not to whether ordinance substantially burdened the Muslim group. As the court stated: "The City's approval of applications for zoning exceptions by other churches suggests that it did not treat all applicants alike. This undermines the City's contention that the Board denied a zoning exception to the Muslims solely for the purposes of traffic control and public safety." [97] Irrespective of the city's possible motivation, the burden on the Muslims' use of their property for religious purposes was substantial.

All five of the cases on which the City relies illustrate that the existence and degree of a zoning restriction's burden on religious exercise are practical matters to be determined based on the specific circumstances of a particular case. A restriction need not be completely prohibitive to be substantial; it is enough that alternatives for the religious exercise are severely restricted. The City notes that no one in the present case was prohibited from attending church, but religious exercise is not so confined. The cases support our conclusion that Ordinance 1999–02 substantially burdened Barr's religious exercise.

## C

"To say that a person's right to free exercise has been burdened, of course, does not mean that he has an absolute right to engage in the conduct." [98] The government may regulate such conduct in furtherance of a compelling interest.

Consistent with its contention that TRFRA does not apply to zoning, the City asserts in its brief: "Zoning itself is a compelling state interest." That position, as we have already discussed, has been rejected by this Court and by the Supreme Court.[99] Although the government's interest in the public welfare in general, and in preserving a common character of land areas and use in particular, is certainly legitimate when properly motivated and

---

**94.** *Id.* at 302.

**95.** *Id.* at 294 ("While the city ordinance restricts the use of any property in this type of residential area or in the City's commercial district as a church, 25 churches, all Christian, are located in similarly regulated areas. Sixteen of these churches occupied their present sites before the ordinance became effective, and nine moved in thereafter with the benefit of an exception. Only the Islamic Center has ever been denied an exception.").

**96.** *Id.* at 296 ("Next door to the Islamic Center is an impressive brick two-story building, graced by stately white columns and a broad veranda, once occupied as a fraternity house. This is now Maranatha House, a residence and worship center for a Pentecostal Christian denomination. Five more churches lie within a quarter mile of these two religious centers.").

**97.** *Id.* at 302.

**98.** *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 894, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (O'Connor, J., concurring in the judgment).

**99.** *See supra* Part III.

appropriately directed, the assertion that zoning ordinances are per se superior to fundamental, constitutional rights, such as the free exercise of religion, must fairly be regarded as indefensible.

 The Supreme Court held in *Smith*, not that the government's interest in neutral laws of general application is always compelling when compared to the people's interest in fundamental rights, but only that the United States Constitution does not require the two interests to be balanced every time they conflict. RFRA, RLUIPA, and TRFRA, as well as laws enacted other states, now require that balance by statute when government action substantially burdens the free exercise of religion. The government's interest is compelling when the balance weighs in its favor—that is, when the government's interest justifies the substantial burden on religious exercise. Because religious exercise is a fundamental right, that justification can be found only in "interests of the highest order",[100] to quote the Supreme Court in *Yoder*, and to quote *Sherbert*, only to avoid " 'the gravest abuses, endangering paramount interest[s]' ".[101] Thus, in *Yoder*, the state's interest in children attending the first two years of high school was not sufficiently compelling to justify the substantial burden on the Amish people's religious conviction that children be taught at home.[102] And in *Sherbert*, the state's interest in a uniform unemployment compensation system and the reduced possibility of fraudulent claims was not compelling enough to deny benefits to a claimant who had refused to work on Saturday because of her religious beliefs.[103]

The Supreme Court recently explained in *Gonzales v. O Centro Espírita Beneficente União do Vegetal* that "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." [104] To satisfy this requirement, the Supreme Court stated, courts must "look[ ] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." [105] Acknowledging that there is "no cause to pretend that the task ... is an easy one",[106] the Court held that RFRA requires that "courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue." [107]

In this regard, there is no basis for distinguishing RFRA from TRFRA; the same requirement verbatim is in both. The Sinton City Council's recitation in Ordinance 1999–02—that "the requirements of this section are reasonably necessary to preserve the public safety, morals, and general welfare"—is the kind of "broadly formulated interest[ ]" that does not satisfy the scrutiny mandated by TRFRA. Likewise, the trial court's brief finding—that "[t]he ordinance was in furtherance of

**100.** *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

**101.** *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (quoting *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)).

**102.** *Yoder*, 406 U.S. at 228–229, 92 S.Ct. 1526.

**103.** *Sherbert*, 374 U.S. at 407, 83 S.Ct. 1790.

**104.** 546 U.S. 418, 430–431, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006).

**105.** *Id.* at 431, 126 S.Ct. 1211.

**106.** *Id.* at 439, 126 S.Ct. 1211.

**107.** *Id.*

a compelling government interest"—falls short of the required scrutiny. As Professor Douglas Laycock has observed regarding TRFRA and state RFRAs generally: "the compelling interest test must be taken seriously. Courts and litigants must focus on real and serious burdens to neighboring properties, and not assume that zoning codes inherently serve a compelling interest, or that every incremental gain to city revenue (in commercial zones), or incremental reduction of traffic (in residential zones), is compelling." [108]

Although TRFRA places the burden of proving a substantial burden on the claimant, it places the burden of proving a compelling state interest on the government. The City argues that its compelling interest in Ordinance 1999–02 is established by statutes providing that correctional facility regulations presumptively meet strict scrutiny. As we have already explained, however, these statutes are inapplicable. [109]

The City also asserts that Ordinance 1999–02 serves a compelling interest in advancing safety, preventing nuisance, and protecting children. But there is no evidence to support the City's assertion with respect to "the particular practice at issue"—Barr's ministry. In fact, the only evidence is to the contrary: Barr testified that he admitted only nonviolent offenders to his program, and no aspect of his operation ever presented a safety problem, a nuisance, or a threat to children. He and the city manager both testified that they were not aware of any complaints of disturbance. The City cites no studies or experiences with halfway houses to support its professed concerns. The City was not, of course, required to wait until disturbances occurred, possibly causing significant harm, before taking measures to prevent them, but neither could it assert a compelling interest in practically excluding a religious ministry from operating within the city limits based on nothing more than speculation.

The City argues that the restrictions in Ordinance 1999–02 are similar to those imposed by state law on facilities run by or under contract with the government.[110] But the State is free to impose whatever restrictions it chooses on itself and local governments;[111] those governments have no Free Exercise rights of their own. The State's interest in restricting halfway houses run by or for itself or local governments when no fundamental right is implicated does not suddenly become compelling when free religious exercise is substantially burdened. Moreover, the City's argument is undercut by the fact that it made no effort to enforce Ordinance 1999–02 for over a year after it was adopted. An interest that need not be enforced against the very thing it is adopted to prevent can hardly be considered compelling.

None of the four federal cases decided before *Smith* upholding the application of zoning laws to worship facilities supports the City's arguments regarding compelling interest. Because those cases found no substantial burden on religious exercise, the government's interest was not required to be compelling. In the fifth case, *Islam-*

---

**108.** Douglas Laycock, *State RFRAs and Land Use Regulation*, 32 U.C. Davis L. Rev. 755, 784 (1999).

**109.** *See supra* note 82 and accompanying text.

**110.** *See supra* note 11.

**111.** *See Ysursa v. Pocatello Educ. Ass'n,* —— U.S. ——, ——, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009) (" 'Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities.' " (quoting *Reynolds v. Sims,* 377 U.S. 533, 575, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964))).

*ic Center,* the court held that the city's failure to produce evidence of a compelling interest in denying permission for a Muslim mosque in a residential area was fatal to the application of the zoning ordinance. The City's cases do not support its position.

In addressing the cases on which the City relies, we should not be read to suggest that worship facilities and halfway houses are no different, or that the balancing of interests required by strict scrutiny is the same, regardless of the nature of the religious conduct. TRFRA's requirement of an assessment of the burden "to the person" necessitates taking into account the individual circumstances. We have focused on the five cases the City cites because of its reliance on them, but as we have noted, the applicable principles must also be drawn from other contexts.

The City's failure to establish a compelling interest in this case in no way suggests that the government never has a compelling interest in zoning for religious use of property or in regulating halfway houses operated for religious purposes.[112] TRFRA guarantees a process, not a result. The City's principal position in this case has been that it is exempt from TRFRA. We do not hold that the City could not have satisfied TRFRA; we hold only that it failed to do so.

**D**

Finally, TRFRA requires that even when the government acts in furtherance of a compelling interest, it must show that it used the least restrictive means of furthering that interest. The City has made no effort to show that it complied with this requirement. Ordinance 1999–02 is very broad. If as the city manager testified, locations in the City of Sinton more than 1,000 feet from a residential area, school, park, recreational area, or church are "pretty close to nonexistent", the ordinance effectively prohibits any private "residential facility ... operated for the purpose of housing persons ... convicted of misdemeanors ... within one ... year after having been released from confinement in any penal institution" inside the city limits. Read literally, this would prohibit a Sinton resident from leasing a room to someone within a year of his having been jailed for twice driving with an invalid license.[113] Such restrictions are certainly not the least restrictive means of insuring that religiously operated halfway houses do not jeopardize children's safety and residents' wellbeing.

**V**

We conclude, based on the record before us, that Ordinance 1999–02, as applied to Barr's ministry, violates TRFRA. Accordingly, we reverse the judgment of the court of appeals. Because the trial court did not reach the issues of appropriate injunctive relief, actual damages, and attorney fees, we remand the case to the trial court for further proceedings in accordance with this opinion.

---

**112.** *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 76, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (stating that it "may very well be true" that "if there were countywide zoning, it would be quite legal to allow live entertainment in only selected areas of the county and to exclude it from primarily residential communities, such as the Borough of Mount Ephraim").

**113.** A second conviction for driving with an invalid license is a Class B misdemeanor. TEX. TRANSP. CODE § 521.457(f). The maximum punishment for a Class B misdemeanor is a $2,000 fine and 180 days' imprisonment. TEX. PENAL CODE § 12.22.